1  Benjamin Heikali (SBN 307466)
   Katherine Phillips (SBN 353048)
2  **TREEHOUSE LAW, LLP**
   2121 Avenue of the Stars, Suite 2580
3  Los Angeles, CA 90067
   Tel: (310) 751-5928
4  bheikali@treehouselaw.com
   kphillips@treehouselaw.com
5

6  *Attorney for Plaintiffs and the Putative Class*

7  [Additional counsel listed on signature page]

8

9

10

11

12                    **UNITED STATES DISTRICT COURT**
13                  **NORTHERN DISTRICT OF CALIFORNIA**

14
   *IN RE DREAMLAND BABY CO. WEIGHTED*          Master File No. 3:24-CV-02996-CRB
15 *SLEEP PRODUCTS LITIGATION,*                  Related Cases:
                                                 3:24-CV-03379-CRB
16 This Document Relates To:                     3:24-CV-03406-CRB
   ALL CASES                                     3:24-CV-03763-CRB
17
                                                 **CONSOLIDATED CLASS ACTION**
18                                               **COMPLAINT**

19                                               Judge: Hon. Charles R. Breyer
20

21

22

23

24

25

26

27

28

---

CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs Victoria Monsch, Megan Fehrenbach, Tuliisa Miller, Amy Alvarez, Johannah Harrington and Haley Muse (collectively, "Plaintiffs"), individually and on behalf of all others similarly situated ("the Class"), hereby bring this Consolidated Class Action Complaint against Defendant Dreamland Baby Co. ("Dreamland" or "Defendant"), and, in support thereof, allege as follows:

## INTRODUCTION

1.      Dreamland manufactures, markets and sells weighted sleep products for children, including, but not limited to, weighted sleep sacks such as the Dream Weighted Sleep Sack, and weighted swaddles such as the Dream Weighted Sleep Swaddle, the Dream Weighted Transition Swaddle, and the Bamboo Weighted Transition Swaddle and a Weighted Toddler Blanket (hereinafter, the "**Products**").

2.      Dreamland's marketing and labeling of the Products centers on a campaign promoting that they improve sleep, are safe, and comply with scientific, medical and industry guidance and regulatory standards for baby sleep products, while completely omitting that the weight of the reliable scientific evidence concludes the Products pose a risk of harm to children—specifically, an Oxygen Reduction Danger, Suffocation Danger, and Deep Sleep Danger (collectively, the "**Material Dangers**").[1] As discussed herein, to differentiate its Products from traditional sleep blankets and non-weighted sleep sacks and swaddles, Dreamland has labeled and advertised the Products with representations about their medical approval, safety, and scientific support, leading reasonable consumers to believe that the Products are safe for babies, approved by independent and qualified medical professionals, and comply with scientific, medical and industry guidance and regulatory standards for baby sleep products.

3.      Both the online representations and Products' labels tout that the Products are "Safety Certified," "Doctor Approved," and "Backed by Science," and the Dreamland website is littered with similar promises that the Products are "safe" and meet the highest quality standards, including

---

[1] *See* Section III, *infra*.

approval by a pediatric pulmonologist for breathing safety, Neonatal Intensive Care Unit ("**NICU**") nurses and certified sleep consultants.

4.      Knowing consumers trust the American Academy of Pediatrics ("**AAP**") and Consumer Product Safety Commission ("**CPSC**"), Dreamland further markets its Products as "design[ed] . . . according to the American Academy of Pediatrics safe sleep guidelines," and promises that the Products "exceed[] all United States Consumer Product Safety Commission Standards." Collectively, Dreamland's prominent online representations and Products' labels touting the Products' safety and compliance with scientific, medical and industry guidance and regulatory standards, including the "Safety Certified," "Doctor Approved" and "Backed by Science" representations, are herein referred to as the "**Challenged Representations**."

5.      Not only are the Challenged Representation a far overreach, but contrary to the Challenged Representations, Dreamland fails to disclose that the weight of the credible scientific and medical evidence concludes that the Products pose a risk of the Material Dangers to children. Nor does Dreamland disclose that the Products do not meet scientific, medical and industry guidance and regulatory standards for baby sleep products. Indeed, the AAP, the CPSC, the U.S. National Institute of Child Health and Human Development ("**NIH**") and the U.S. Center of Disease Control and Prevention ("**CDC**") have all advised *against* the use of weighted sleep sacks and weighted swaddles on children, with some of these agencies expressly warning that these baby products are harmful (these omissions are herein collectively referred to as the "**Material Safety Omissions**").

6.      Dreamland is well aware of the Material Dangers posed in using weighted baby sleep sacks and swaddles, yet it continues to market and advertise the Products with the Challenged Representations while failing to disclose the risks associated with using the Products.

7.      The Challenged Representations and Material Safety Omissions are thus misleading to a reasonable consumer as no reasonable consumer would purchase or pay a premium price for the Products if they knew the weight of the credible scientific and medical evidence concludes the that the Products pose a risk of the Material Dangers and do not meet scientific, medical and industry guidance and regulatory standards.

8.      Plaintiffs and other consumers purchased the Products and paid a premium price based on Dreamland's misrepresentations and omissions regarding the Products. Had Plaintiffs and other consumers been aware of the risks of the Material Dangers, and/or that the Products do not comply with scientific, medical and industry guidance and regulatory standards, they would not have purchased the Products, or would have paid significantly less for them. Accordingly, Plaintiffs and the Class have been injured by Dreamland's business practices.

## PARTIES

### *Plaintiff Victoria Monsch*

9.      Plaintiff Victoria Monsch is a citizen of California and currently resides in Santa Monica, California. Plaintiff Monsch purchased one Dreamland Baby Weighted Sleep Sack from the Dreamland Baby website in October 2023 for approximately $89.

10.      Prior to purchasing the Product, Ms. Monsch reviewed Dreamland's website, including the Challenged Representations. Plaintiff Monsch observed no safety warnings, no mention of a risk of harm to her child from using the Product, and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Product.

11.      Based on the Challenged Representations and Material Safety Omissions, Plaintiff Monsch reasonably believed the Product did not include a risk of the Material Dangers to her child and that the Product met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

12.      Had Plaintiff Monsch known that the Product carried a risk of the Material Dangers, did not meet scientific, medical or industry guidelines and regulatory standards for baby sleep products, or that the AAP, CPSC, NIH and CDC advised against use of the Product, she would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff has been directly financially injured by Defendant's deceptive and misleading advertising.

13.      Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Monsch would purchase the Products, as advertised, if they did not carry a risk of the Material Dangers to her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

14.     Although Plaintiff Monsch regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the representations on the Products' front labels and on Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meets scientific, medical and industry guidelines and regulatory standards for baby sleep products.

***Plaintiff Megan Fehrenbach***

15.     Plaintiff Megan Fehrenbach is a citizen of California and currently resides in Escondido. Plaintiff Fehrenbach purchased two Dreamland Baby Weighted Sleep Sacks from the Dreamland Baby website on December 10, 2023 for approximately $95.90 combined.

16.     Prior to purchasing the Products, Ms. Fehrenbach reviewed Dreamland's website, including the Challenged Representations. Plaintiff Fehrenbach saw no safety warnings, no mention of a risk of harm to her child from using the Products, and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Products.

17.     Based on the Challenged Representations and Material Safety Omissions, Plaintiff Fehrenbach reasonably believed the Products did not include a risk of Material Dangers to her child and that the Products met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

18.     Had Plaintiff Fehrenbach known that the Products carried a risk of the Material Dangers, did not meet scientific, medical and industry guidelines and regulatory standards for baby sleep products, or that the AAP, CPSC, NIH and CDC advised against use of the Products, she

-4-

would not have purchased the Products, or would have paid significantly less for them. As such, Plaintiff Fehrenbach has been directly financially injured by Defendant's deceptive and misleading advertising.

19.    Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Fehrenbach would purchase the Products, as advertised, if they did not carry a risk of Material Dangers to her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

20.    Although Plaintiff Fehrenbach regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff Fehrenbach currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the representations on the Products' front labels and on Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards for baby sleep products.

**Plaintiff Tuliisa Miller**

21.    Plaintiff Tuliisa Miller is a citizen of California and currently resides in Contra Costa County. Plaintiff Miller purchased the Dreamland Baby Dream Weighted Transition Swaddle from Target in Contra Costa County in or around 2022 for approximately $80.00.

22.    Prior to purchasing the Product, Ms. Miller reviewed the Product's packaging, including the Challenged Representations. Plaintiff Miller saw no safety warnings, no mention of the risk of Material Dangers to her child from using the Product and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Product.

23.    Based on the Challenged Representations and Material Safety Omissions, Plaintiff Miller reasonably believed the Product did not include a risk of the Material Dangers to her child and that the Product met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

24.    Had Plaintiff Miller known that the Product carried a risk of the Material Dangers, did not meet scientific, medical and industry guidelines and regulatory standards for baby sleep products or that the AAP, CPSC, NIH and CDC advised against use of the Product, she would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff Miller has been directly financially injured by Defendant's deceptive and misleading advertising.

25.    Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Miller would purchase the Product, as advertised, if it did not carry the risk of Material Dangers for use for her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

26.    Although Plaintiff Miller regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff Miller currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the representations on the Products' front labels and Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards for baby sleep products.

***Plaintiff Haley Muse***

27.    Plaintiff Haley Muse is a citizen of Missouri and currently resides in St. Charles

-6-

County, Missouri. Plaintiff Muse purchased one Baby Bamboo Pajamas with DreamCuffs and two Dream Weighted Transition Swaddles from Defendant's online store for $119.93 combined.

28.     Prior to purchasing the Products, Ms. Muse reviewed Dreamland's website, including the Challenged Representations. Plaintiff Muse saw no safety warnings, no mention of a risk of the Material Dangers to her child from using the Products and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Products.

29.     Based on the Challenged Representations and Material Safety Omissions, Plaintiff Muse reasonably believed the Products did not include the risk of Material Dangers to her child and that the Products met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

30.     Had Plaintiff Muse known that the Products carried a risk of Material Dangers, did not meet scientific, medical and industry guidelines and regulatory standards for baby sleep products, or that the AAP, CPSC, NIH and CDC advised against use of the Products, she would not have purchased the Products, or would have paid significantly less for them. As such, Plaintiff Muse has been directly financially injured by Defendant's deceptive and misleading advertising.

31.     Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Muse would purchase the Products, as advertised, if they did not carry the risk of Material Dangers to her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

32.     Although Plaintiff Muse regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the Challenged Representations and Material Safety Omissions on the Products' front labels and Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and

would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards for baby sleep products.

***Plaintiff Amy Alvarez***

33.     Plaintiff Amy Alvarez is a citizen of New York and currently resides in Jamaica, New York. Plaintiff Alvarez purchased two Dreamland Baby Weighted Sleep Sacks from the Dreamland Baby website on January 10, 2022, for approximately $144.50 combined.

34.     Prior to purchasing the Products, Ms. Alvarez reviewed Dreamland's website, including the Challenged Representations. Plaintiff Alvarez saw no safety warnings, no mention of a risk of harm to her child from using the Products and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Products.

35.     Based on the Challenged Representations and Material Safety Omissions, Plaintiff Alvarez reasonably believed the Products did not include the risk of Material Dangers to her child and that the Products met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

36.     Had Plaintiff Alvarez known that the Products carried the risk of Material Dangers, did not meet scientific, medical and industry guidelines and regulatory standards for baby sleep products or that the AAP, CPSC, NIH and CDC advised against use of the Products, she would not have purchased the Products, or would have paid significantly less for them. As such, Plaintiff Alvarez has been directly financially injured by Defendant's deceptive and misleading advertising.

37.     Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Alvarez would purchase the Products, as advertised, if they did not carry the risk of Material Dangers to her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

38.     Although Plaintiff Alvarez regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff

currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the Challenged Representations and Material Safety Omissions on the Products' front labels and Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards for baby sleep products.

***Plaintiff Johannah Harrington***

39.     Plaintiff Johannah Harrington is a citizen of Illinois and currently resides in Chicago. Plaintiff Harrington purchased a Dreamland Baby Weighted Sleep Sack from the Dreamland Baby website on December 15, 2023, for approximately $92.00.

40.     Prior to purchasing the Product, Ms. Harrington reviewed Dreamland's website, including the Challenged Representations. Plaintiff Harrington saw no safety warnings, no mention of a risk of harm to her child from using the Product and no information regarding recommendations of the AAP, CPSC, NIH or CDC against the use of the Product.

41.     Based on the Challenged Representations and Material Safety Omissions, Plaintiff Harrington reasonably believed the Product did not include the risk of Material Dangers to her child and that the Product met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

42.     Had Plaintiff Harrington known that the Product carried the risk of Material Dangers, did not meet scientific, medical and industry guidelines and regulatory standards for baby sleep products or that the AAP, CPSC, NIH and CDC advised against use of the Products, she would not have purchased the Product, or would have paid significantly less for it. As such, Plaintiff Harrington has been directly financially injured by Defendant's deceptive and misleading advertising.

43.     Despite Defendant's Challenged Representations and Material Safety Omissions, Plaintiff Harrington would purchase the Products, as advertised, if they did not carry the risk of Material Dangers to her child and met scientific, medical and industry guidelines and regulatory standards for baby sleep products.

44.     Although Plaintiff Harrington regularly shops at retailers that carry the Products, absent an injunction of Defendant's deceptive advertising, she will be unable to rely with confidence on Defendant's advertising of the Products in the future. Furthermore, while Plaintiff Harrington currently believes the Products' labeling and advertising are inaccurate, she lacks personal knowledge as to Defendant's specific business practices, and thus, she will not be able determine whether the Products truly are safe. This leaves doubt in her mind as to the possibility that at some point in the future the Products could be made in accordance with the Challenged Representations and Material Safety Omissions on the Products' front labels and Defendant's website and advertising. This uncertainty, coupled with her desire to purchase the Products, is an ongoing injury that can and would be rectified by an injunction enjoining Defendant from making the Challenged Representations and Material Safety Omissions. In addition, other Class Members will continue to purchase the Products, reasonably but incorrectly, believing that they are safe and meet scientific, medical and industry guidelines and regulatory standards for baby sleep products.

***Defendant Dreamland Baby Co.***

45.     Defendant Dreamland Baby Co. is a California corporation headquartered at 3383 Deer Hollow Dr., Danville, California 94506. Upon information and belief, Dreamland's relevant business decision making, including its marketing for the Products, originated and continues to originate out of its California headquarters and/or its presence in California. Indeed, both Ms. Williams, the CEO of Dreamland, and Ellie Miller, the Vice President of Marketing for Dreamland, both of whom appear to have participated in discussions with the CPSC (*see* https://www.cpsc.gov/s3fs-public/Dreamland-Baby-Feldman-MeetingLog.pdf?VersionId=Gs3sXbHvRS4iRv4tXTbnZyD0zSGB8eXe), reside in Southern California.

CONSOLIDATED CLASS ACTION COMPLAINT

1

**JURISDICTION AND VENUE**

2      46.      This Court has subject matter jurisdiction under the Class Action Fairness Act, 28

3   U.S.C. § 1332(d)(2)(A), because there are 100 or more class members; at least one class member is

4   a citizen of a state that is diverse from Defendant's citizenship; and the matter in controversy exceeds

5   $5 million, exclusive of interest and costs.

6      47.      This Court has personal jurisdiction over Defendant because Defendant operates,

7   conducts and engages in substantial business in this judicial district, including, but not limited to,

8   the promotion, sale, marketing and distribution of its Products; Defendant committed tortious acts

9   in this State through its misrepresentations and omissions related to the sale, marketing and

10   distribution of the Products; Defendant caused injury to persons within this State; and a substantial

11   portion of the actions giving rise to the claims took place in this State, given Defendant is

12   headquartered in Danville, California.

13      48.      Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(b)(2) because this

14   is a judicial district in which a substantial part of the events, misrepresentations and omissions giving

15   rise to the claim occurred, or a substantial part of property that is the subject of the action is situated.

16   This is especially true given Defendant is headquartered in Danville, California.

17

**FACTUAL ALLEGATIONS**

18   **I.      Dreamland Markets the Products as Safe and Meeting Scientific, Medical and Industry
        Guidelines and Regulatory Standards**

19

20      49.      Dreamland manufactures, markets and sells several substantially similar Products in

21   swaddle, sleep sack and blanket varieties:[2]

22

23

24

25

26

27   _____

28      [2]https://dreamlandbabyco.com/collections/sleep-sacks-swaddles-and-blankets (last visited Aug.
        7, 2024).

NEW PRINT

Dream Weighted Sleep Sack
$89.00

SALE

Dream Weighted Sleep Swaddle
$89.00

Dream Weighted Transition Swaddle
From $73.60   $92.00

FINAL SALE

Weighted Toddler Blanket
$99.00

FINAL SALE

Dream Weighted Transition Swaddle
$73.60   $92.00

Weighted Toddler Blanket
$58.90   $99.00

50.     On both its website and the Products' packaging, Dreamland has labeled and advertised the Products with the Challenged Representations—differentiating the Products from traditional sleep blankets, non-weighted sleep sacks and swaddles—while promoting the Products' supposed safety, approval and certification by independent and qualified medical professionals and compliance with scientific, medical and industry guidance and regulatory standards.

51.     As depicted below, the front labels and packaging of the Products, as well as the Dreamland website, promise that the Products are "Safety Certified," "Doctor Approved" and "Backed by Science:" *See examples below*: [3] [4]



[3]https://www.kidizen.com/items/dreamland-baby-weighted-swaddle-or-sleep-sack-0-6-8611846 (last visited Aug. 7, 2024).

[4]https://web.archive.org/web/20230131000956/https://dreamlandbabyco.com/products/dream-weighted-sleep-sack (last visited Aug. 7, 2024).



CONSOLIDATED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



CONSOLIDATED CLASS ACTION COMPLAINT

ABOUT DREAMLAND BABY

Sleep matters! That's why we take pride in every detail of our mom-created, doctor-approved, and backed-by-science sleep solutions.

Our Weighted Sleep Sacks and Blankets feature our proprietary CoverCalm® Technology, ensuring even weight distribution from your baby's shoulders to toes. This evenly distributed weight is what sets us apart and harnesses the power of deep touch stimulation. So what does that mean for you? A happy, relaxed, sleeping baby!



**EASY RETURNS**

30-Day, eco-friendly, returns & exchanges

# Why Choose the Dream Weighted Sleep Sack?

CoverCalm™ Technology + Premium Sleep Sack = Better Sleep

### Safe

Safety testing and a clinical trial demonstrating safety were completed by Dreamland Baby.

### Optimal Temperature

Lightweight and breathable for year-round use. The 0.6 TOG is perfect for both warm and cool climates.

### Gently Weighted

Weighted sleep sacks are proven to calm your baby with Deep Pressure Stimulation so they can relax and sleep soundly.



CONSOLIDATED CLASS ACTION COMPLAINT

1

2

## Benefits of The Weighted Sack

3

| Benefits | Safety Benefits |
| --- | --- |
| Relaxes and induces sleep | Natural and toxic-free materials |
| Increases serotonin & melatonin | Exceeded all United States Consumer Product Safety Commission standards |
| Naturally reduces stress and anxiety | Acknowledged by the International Hip Dysplasia Institute as a "hip-healthy" product |
| 100% soft, natural cotton for comfort | |
| Bottom zipper for easy diaper change | Designed in partnership with Pediatricians, Neonatal Intensive Care Units (NICU) nurses and Certified Sleep Consultants |
| Perfect for learning to sleep in longer stretches | |
| 100% safe for babies | Backed by science according to this clinical study |

14        52.    Dreamland captures desperate parents' attention by substantiating its Challenged

15  Representations through website promises that the Products are "designed in collaboration with

16  pediatricians, NICU nurses, and certified sleep consultants" and "reviewed by pediatric

17  pulmonologist for breathing safety."[5]

18

19

20

21

22

23

24

25

26

27
_____
[5]https://dreamlandbabyco.com/products/dream-weighted-sack-
28  swaddle?variant=40784606330943 (last visited Aug. 7, 2024).

-17-

DESCRIPTION                                                    >

WHY YOU'LL LOVE IT                                            >

LEARN MORE                                                    ⌄

Gentle weight is located on the front (or top) of the
sack only and is not intended to restrict movement.

This sleep sack is a 1.0 TOG, perfect for 68-73°F or
21-23°C

Designed in collaboration with pediatricians, NICU
nurses and certified sleep consultants

Reviewed by pediatric pulmonologist for breathing
safety

Inner beads are non-toxic, BPA free

For safety reasons, we do not recommend sizing up

53.    As depicted above and further below, until more recently the website Product pages also advertised the safety of the Products:[6]

DREAM WEIGHTED SLEEP SACK

CoverCalm® Technology

Evenly distributed weight from your baby's shoulders to toes to
naturally reduce stress and give your baby the feeling of security
and comfort.

Care                                                                      >

Frequently Asked Questions                                                ⌄

Are weighted sleep sacks for babies safe?

The benefit of a gently weighted sleep sack is that they are a comfortable and cozy alternative to loose blankets, which should never be used in a crib. When used properly and sized correctly, these wearable blankets keep your little one warm without overheating, which can be a risk factor for SIDS. Learn more about sleep sack safety here!

Frequently Asked Questions                                                ⌄

Are weighted swaddles safe?

Yes! In fact, Dreamland Baby was developed in partnership with pediatricians, NICU nurses, and certified sleep consultants. Reviewed by pediatric pulmonologist for breathing safety.

---

[6]*See,            e.g.,            supra            note            4;* https://web.archive.org/web/20240324063848/https://dreamlandbabyco.com/products/dream-weighted-sack-swaddle (last visited Aug. 7, 2024).

CONSOLIDATED CLASS ACTION COMPLAINT

54.   Dreamland's website FAQs on product safety (which were posted up until at least August 2023) similarly represented that the Products are safe and "exceed all U.S. Consumer Product Safety Commission standards:"[7]

Is Dreamland Baby® safe?                                                                      ⌃

Safety is our number one priority. As a mom-owned business, nothing is more important to us, which is why we partnered with pediatricians, NICU nurses, and certified sleep consultants when developing our weighted sleep sacks.

Our products exceed all U.S. Consumer Product Safety Commission standards and we use only natural and non-toxic materials. The International Hip Dysplasia Institute acknowledges the Dreamland Baby Weighted Swaddle as a "hip-healthy" product when used as directed.

We also pulled research from this clinical study demonstrating that weighted blankets are safe for newborns, significantly increase calm feelings, and improve sleep patterns. You can learn more about our commitment to safety here. With over 500,000 products sold, we have never had an adverse event caused by our products.

55.   The same claim (and others) was made on a Product safety page on the Dreamland website:[8]



We've proudly exceeded all United States
Consumer Product Safety Commission
Standards

We use 100% natural, soft cotton. Our fabrics are not treated with flame retardant and the inner poly pellet beads are non-toxic. We source only the best materials for ultimate comfort and safety.

Rigorously Tested

Our products undergo both required and non-
required testing

We have the highest standards in quality and safety in every aspect in all of our products.

Safety   Materials   Durability

Thermal Transmittance • Sharp Edges & Points • Small parts: Choking Hazard • Small parts: Use & Abuse • Small parts: Torque & Tension • Suffocation Hazards • Tracking Labels for Children's Sleepwear • Size Verification of Children's Sleepwear

---

[7] https://web.archive.org/web/20230808075326/https://dreamlandbabyco.com/pages/faq-producty-safety-and-care (last visited Aug. 7, 2024).

[8] https://web.archive.org/web/20230926020034/https://dreamlandbabyco.com/pages/safety?_pos=1&_sid=119413d57&_ss=r (last visited Aug. 7, 2024).

-19-

56.     Dreamland's website also features a blog post from February 28, 2024, dedicated to convincing consumers that their Products are safe for babies to use while sleeping, including a section where Dreamland states that it is following guidelines of "safe sleep" outlined by the AAP:[9]

### How We Know Our Weighted Swaddles and Weighted Sacks are Safe

In this article, we've confirmed that wearable blankets are a safe way for your baby to sleep providing you follow the other guidelines of safe sleep outlined by the AAP (such as putting your baby to sleep on their back, on a firm surface, without other soft bedding in the crib).

We've also described how advantageous a weighted sack such as the one offered by Dreamland Baby can be for your little one.

57.     Thus, for the avoidance of doubt, Dreamland had a pervasive and consistent marketing campaign—both on its website and the Products' labeling—that differentiated its Products from traditional sleep blankets and non-weighted sleep sacks and swaddles, while doubling down on their safety, compliance with scientific, medical and industry guidelines and regulatory standards, and systematically *omitting* that the weight of the credible scientific and medical evidence concludes that the Products pose the risk of Material Dangers to children.

58.     Ms. Tara Williams, the CEO and founder of Dreamland Baby Co., is the mastermind behind Dreamland's pervasive and consistent marketing efforts.

59.     In 2019, Ms. Williams presented the Products on the show "Shark Tank" using her personal experience with her children as the basis for the development of the Products.[10] Shark Tank is one of the most-watched reality TV shows that averaged 4.95 million viewers during season 11— the season in which Ms. Williams presented the Products.[11]

---

[9]https://dreamlandbabyco.ca/blogs/news/weighted-sleep-sack-safety-and-how-it-will-help-your-baby-sleep (last visited August 7, 2024); *see also* https://web.archive.org/web/20230926020919/https://dreamlandbabyco.com/blogs/news/weighted-sleep-sack-safety-and-how-it-will-help-your-baby-sleep?_pos=2&_sid=119413d57&_ss=r (last visited Aug. 7, 2024).

[10] https://www.youtube.com/watch?v=MRtJRIldCdU.

[11]  Porter, Rick (June 4, 2020). "TV Ratings: 7-Day Season Averages for Every 2019–20 Broadcast Series". The Hollywood Reporter. Archived from the original on June 6, 2020.

60.     During the episode, Ms. Williams stated that she developed the Products, not only based on her "mother's intuition," but "combined with science behind it."[12] Ms. Williams referenced her background in medical sales and a 2018 clinical study on weighted blankets.[13] Ms. Williams then claimed that she partnered with the authors of the 2018 clinical study and it is through that partnership "that [Dreamland] knows [the Products are] safe."[14] However, as discussed herein, Ms. Williams failed to disclose to the public that the clinical studies relied upon by Dreamland are entirely unrelated to children's use of weighted sleep products and are merely used as a smokescreen to mislead consumers into purchasing its Products without knowledge of the risks to their children when using the Products.[15]

## II.     The Credible Scientific and Medical Evidence Concludes That Weighted Sleep Products, Including Dreamland's Products, Do Not Meet Scientific, Medical and Industry Guidance and Regulatory Standards, and Carry a Risk of Harm, Contrary to the Challenged Representations

61.     Unbeknownst to consumers, the weight of the available scientific and medical evidence on weighted sleep products concludes that these Products pose the risk of Material Dangers to children and do not meet scientific, medical and industry guidance and regulatory standards.

62.     This information is material to reasonable consumers when purchasing a sleep product for children.

63.     On March 13, 2020, ASTM International ("**ASTM**") began efforts to establish design and weight standards for the Products through its product subcommittee.[16] It is notable that the subcommittee was co-chaired by none other than Dreamland's CEO and founder, Ms. Williams, herself.[17]

---

[12] *Supra* note 10 at 3:30-3:54.

[13] *Id*. at 3:54-4:15.

[14] *Id*.

[15] *See* Section V, *infra*.

[16] https://www.astm.org/workitem-wk72273 (last visited Aug. 7, 2024).

[17] https://www.wsaz.com/video/2024/06/10/defective-baby-industry-insiders-questioned-over-involvement-with-setting-own-safety-standards/ (last visited Aug. 7, 2024).

64.     ASTM is a broad organization that develops and publishes standards and technical specifications on a wide variety of materials and products with input from industry participants, regulators and the public. ASTM can adopt these *voluntary standards* through a voting process that involves industry participants and regulators. The CPSC often adopts the voluntary standards in its regulation of products. And for certain products—including toys and many baby products—the CPSC *must* adopt the standards established by the ASTM.

65.     The CPSC rejected (cast a negative ballot on) ASTM's proposed voluntary standards for the Products on multiple occasions, citing NIH and CDC concerns that weighted blankets are unsafe for infants and other young children.[18] The CPSC also strongly recommended that any proposed weight standards, specifically the weight concentration limits over a 10.6 square inch area (which represents the chest area of an average infant), be scientifically proven as safe.[19]

66.     Similarly, the AAP has spoken out against ASTM's attempt to establish standards. In a Policy Statement[20] issued by AAP[21] in 2022, AAP expressly warned that "weighted blankets, weighted sleepers, weighted swaddles, or other weighted objects are not to be placed on or near the sleeping infant."[22] As to swaddles specifically, AAP warned that "[w]eighted swaddle clothing or weighted objects within swaddles are not safe and therefore not recommended."[23]

---

[18]https://www.cpsc.gov/s3fs-public/CPSC-Staff-Comments-on-Wearable-Infant-Blankets-Swaddles-Ballot-ASTM-F15-19-23-03.pdf?VersionId=C171nuNDVDRo4SOdCZmAN5_hPlaC9GRp (last visited Aug. 7, 2024).

[19] *Id.*

[20]https://www.babycenter.com/baby/sleep/aap-safe-sleep-policy-weighted-swaddles-sids   (last visited Aug. 7, 2024).

[21] The AAP is a non-profit professional organization of 67,000 primary care pediatricians, pediatric medical sub-specialists, and pediatric surgical specialists dedicated to the health, safety and well-being of infants, children, adolescents and young adults.

[22]https://publications.aap.org/pediatrics/article/150/1/e2022057990/188304/Sleep-Related-Infant-Deaths-Updated-2022?autologincheck=redirected (last visited Aug. 7, 2024).

[23] *Id.*

67.     In June 2023, AAP doubled down on its policy, outlining its concerns with weighted infant sleep products in a letter to the CPSC and ASTM International.[24] Of note, AAP wrote that "[t]he AAP believes these weighted swaddles and related products are unsafe for infants and does not recommend these products." AAP explained its "clear policy regarding the danger of weighted infant sleep products:"

> The evidence available at this time does not indicate that weighted swaddle products are safe, nor does it demonstrate that they are effective in helping babies sleep longer or with fewer disruptions. Further, it is hypothesized that impaired arousal may contribute to risk of Sudden Infant Death Syndrome (SIDS), so a product that decreases arousal may increase the risk of SIDS.
>
> [. . .]
>
> Even preliminary, non-peer-reviewed data under discussion in ASTM International proceedings suggest these products are associated with concerning reductions in oxygen saturation levels in infants. This means there is evidence that the use of weight sleep products on infants can lead to lower oxygen levels, which if sustained, may be harmful to the developing infant's brain.

68.     In the same letter, AAP also opposed any efforts to develop voluntary safety standards for weighted infant sleep products, stating that voluntary safety standards would send an incorrect message to families that "these unnecessary products are safe."[25]

69.     The AAP provided further context for this policy when Dr. Rachel Moon, the co-chair of the AAP task force on SIDs, explained why weighted blankets, swaddles and sleep sacks were so dangerous to children: "[w]hen babies are first born, their rib cage is not rigid, and so it

---

[24]https://www.documentcloud.org/documents/23849624-aap-letter-61523 (last visited Aug. 7, 2024).

[25] Dreamland is well aware of AAP's position but has blatantly chosen to disregard its policy. https://web.archive.org/web/20231203165603/https://dreamlandbabyco.com/blogs/news/new-aap-guidelines-on-safe-sleep-and-sids-prevention ("The AAP included a statement regarding weighted sleepwear and currently does not recommend its use. The AAP provided no clear clinical evidence against the use of these products, and I will continue recommending them as I've found them to be a valuable and safe sleep aid for my patients.") (last visited Aug. 7, 2024).

doesn't take a lot of pressure to press on it and create obstruction there. *It makes it harder for them to breathe, it makes it harder for their heart to beat properly if there's pressure on there.*"[26]

70.    CPSC has followed course, issuing safe sleep recommendations that also urge families not to use weighted blankets or weighted swaddles.[27] This recommendation is based in part on the NIH and CDC positions on the issue, which are the same.[28] According to CPSC Commissioner Richard L. Trumka, Jr., "[t]hese products are associated with concerning reductions in oxygen saturation levels in infants."[29] Commissioner Trumka also noted that "multiple infant deaths have occurred in weighted infant products."[30]

71.    These warning from the scientific, medical, industry and regulatory communities led United States Senator Richard Blumenthal to write to Dreamland, on numerous occasions, most recently stating that he was "deeply disappointed by [Dreamland's] refusal to engage meaningfully with my office to discuss critical safety concerns concerning your weighted sleep products."[31]

72.    As a result of the AAP and CPSC policies, retailers like Target, Amazon, Walmart, Nordstrom and Babylist have removed weighted infant sleepwear, including weighted sleep blankets, swaddles and sacks—such as the Products—from their shelves and online inventory.[32] "This is a strong first step, and infants deserve more," said AAP President Benjamin D. Hoffman, M.D., FAAP, following this announcement. "Exhausted parents shouldn't have to become part-time

---

[26]https://www.washingtonpost.com/wellness/2024/01/22/weighted-baby-blankets-unsafe/ (last visited Aug. 7, 2024) (emphasis added).

[27]https://www.cpsc.gov/SafeSleep (last visited Aug. 7, 2024).

[28]https://safetosleep.nichd.nih.gov/reduce-risk/safe-sleep-environment (last visited Aug. 7, 2024);                              https://www.cdc.gov/reproductivehealth/features/baby-safe-sleep/index.html#:~:text=Weighted%20products%20such%20as%20weighted,with%20no%20soft%20bedding%20use (last visited Aug. 7, 2024).

[29]https://www.cpsc.gov/s3fs-public/Trumka_Statement_Weighted_Infant_Products_4_26_24_with_attachments.pdf?VersionId=iK5EDmatuGu9_z2jKt8t8BaWndFKwWCh (last visited Aug. 7, 2024).

[30] *Id.*

[31]https://www.blumenthal.senate.gov/download/2024-04-25_blumenthal-letter_follow-up-dreamland-baby (last visited Aug. 7, 2024).

[32]https://www.npr.org/2024/05/02/1248194639/weighted-infant-sleepwear-amazon-target-safety (last visited Aug. 7, 2024).

product safety regulators, but our current system forces them to by allowing infant products onto the market without evidence they are safe. We need a proactive approach that keeps infants safe and gives parents the peace of mind they deserve."[33]

73.     The decisions by major retailers to pull Dreamland's Products, and similar items from their shelves and online inventory, was also met with approval from one CPSC Commissioner, who noted that the retailers were "acting as responsible stewards of public safety [and] focusing on their customers' best interests" in stopping the sale of the items. That Commissioner also noted that he had "sat with parents of a child who died in one of these products, and I carry their grief with me."[34]

**III.     Dreamland Knew, or Should Have Known, that the Weight of the Credible Scientific and Medical Evidence Concludes the Products Pose the Risk of Material Dangers and Failed to Meet Scientific, Medical and Industry Guidance and Regulatory Standards**

74.     Despite the overwhelming consensus of the scientific, medical, industry and regulatory communities described above, Dreamland nonetheless has declined to retract or modify the Challenged Representations or to disclose to consumers the risks of Material Dangers to children when using the Products.

75.     Instead, Dreamland, yet again, doubled down on the Challenged Representations and Material Safety Omissions through a blog post on its website titled: *Dreamland Baby's Commitment to Safety*.[35] In this blog post, Dreamland contends that its "products were designed in collaboration with pediatricians, NICU nurses, and certified sleep consultants and reviewed by a pediatric pulmonologist for breathing safety. The gentle weight is evenly distributed from a baby's shoulders

---

[33]https://publications.aap.org/aapnews/news/28768/AAP-leaders-call-decision-to-pull-harmful-weighted (last visited Aug. 7, 2024).

[34]See *supra* note 29; *see also* https://www.blumenthal.senate.gov/imo/media/doc/2024-04-25_blumenthal_letter_ftc-dreamland_baby_-nested_bean.pdf (last visited Aug. 7, 2024).

[35]https://dreamlandbabyco.com/blogs/news/dreamland-baby-s-commitment-to-safety        (last visited Aug. 7, 2024).

to toes, with no concentration of weight in any one area. The sleep sacks are made of 100% cotton, which is naturally breathable and soft against a baby's delicate skin."[36]

76.     What Dreamland's response makes exceedingly clear is that Dreamland has *no reputable scientific or medical evidence* to refute the weight of the scientific and medical evidence that concludes the Products pose the risk of Material Dangers to children.

77.     Dreamland is also well aware that approximately 3,500 sleep-related infant deaths occur annually in the United States.[37] In 2020, there were approximately 1,389 deaths due to SIDS, 1,062 deaths due to unknown causes and 905 deaths due to accidental suffocation and strangulation in bed.[38]

78.     <u>There is a Consensus that Material Dangers Exist with Weighted Baby Sleepwear.</u> As the CPSC stated in its letter to retailers, there is a "consensus among public health agencies, pediatricians, and Safe Sleep proponents: that weighted infant products, like sleep sacks and swaddles are not safe for infant sleep."[39] The CPSC noted "multiple infant deaths involving weighted infant sleep sacks" as a major cause for concern for weighted baby sleepwear, like the Products.[40] The CPSC also noted that "[three] federal public health agencies and the [AAP], an organization representing 67,000 pediatricians, have issued warnings recommending against the use of weighted infant blankets and wearables," like the Products.[41] Indeed, CPSC, NIH, AAP, and CDC all agree that weighted baby sleepwear, like the Products, pose unreasonable safety hazards for babies.[42]

---

[36] *Id.*

[37] Moon, Rachel Y. et al, AAP TASK FORCE ON SUDDEN INFANT DEATH SYNDROME. *SIDS and Other Sleep-Related Infant Deaths: Updated 2016 Recommendations for a Safe Infant Sleeping Environment*, 138 Pediatrics 5(2016).

[38] *Id.*

[39] U.S. Consumer Prod. Safety Comm'r Rich Trumka, Jr., to Target Corp. Chair and CEO Brian Cornell, Walmart Inc. President and CEO Doug McMillon, Nordstrom CEO Erik B. Nordstrom, and Babylist Founder and CEO Natalie Gordon (Apr. 15, 2024), *see also supra* note 29.

[40] *Id.*

[41] *Id.*

[42] *Id.*

79.   <u>Material Dangers Defined</u>. The Products pose three distinct dangers that, despite the consensus of the dangers' existence, Dreamland wholly fails to inform or warn consumers of. These include:

a.   The danger that putting even gentle pressure on babies' rib cages causes an obstruction, which makes it harder for the babies to breathe and for their heart to beat properly, thus reducing the flow of oxygen which negatively impacts brain development (the "**Oxygen Reduction Danger**");[43]

b.   The danger that the Products' weight makes it more difficult for babies to get out of unsafe sleeping positions, by, for example, being able to roll back onto their backs or move the swaddle or sleep sack from covering their mouth or nose (the "**Suffocation Danger**");[44] and

c.   The danger that babies will fall into a deep sleep, which disrupts their ability to develop the protective systems to be able to startle themselves and wake up to restabilize their systems as a critical part of their development (the "**Deep Sleep Danger**"),[45] (collectively the "**Material Dangers**").

80.   <u>Oxygen Reduction Danger</u>. Unlike putting weight from a weighted blanket on an adult's chest, pediatricians state that putting weight on a baby's chest is extremely dangerous because a baby's rib cage is not fully rigid nor fully developed, and thus cannot sustain even gentle pressure.[46] Indeed, Dr. Rachel Moon, the nation's leading expert on safe infant sleep, and co-chair

---

[43] American Academy of Pediatrics, ASTM F15-19 Weighted Infant Products, June 15, 2023.

[44] Lauren Kirchner, *Pediatricians Warn that Weighted Baby Blankets, Sleep Sacks, and Swaddles are Not Safe*, CONSUMER REPS, July 26, 2023, https://www.consumerreports.org/babies-kids/childsafety/weighted-baby-blankets-sleep-sacks-swaddles-are-not-safe-a6236206799/ ("Medical experts say that even the 'gentle pressure' described by the manufacturers of weighted sleep products can be dangerous for infants for multiple reasons.") (last visited Aug. 7, 2024).

[45] *Id.*

[46] *Id.*

of AAP's task force on SIDs, has stated that even gentle pressure on a baby's rib cage from a weighted sleep sack, swaddle or blanket "makes it harder for them to breathe, it makes it harder for their heart to beat properly if there's pressure on there."[47] This disruption of airflow and heartbeat can cause severe brain damage to babies from "concerning reductions in oxygen saturation levels" as "there is evidence that the use of weight sleep products on infants can lead to lower oxygen levels, which if sustained, may be harmful to the developing infant's brain."[48] When an infant's cells receive too little oxygen, their cells do not receive the proper energy they require, which leads to these cells either working improperly or dying off.[49] This can lead to the improper development of critical organs such as the baby's brain and heart.[50]

81.    <u>Suffocation Danger</u>. The second Material Danger associated with weighted baby sleepwear products, like Dreamland's Products, is that weighted baby sleepwear products make it harder for babies to move themselves out of unsafe sleeping positions.[51] The AAP recommends that the safest sleeping position for babies is on their back—not their stomach.[52] The Products, however, create the unreasonable safety hazard that if babies roll onto their stomach while sleeping that they will not be able to roll back onto their backs (*i.e.*, the safer position) with the added weight of the weighted sleep sack or swaddle.[53] Additionally, there is the risk that the weighted sleep sack or swaddle will shift out of position while the baby is sleeping and cover the baby's mouth or nose, thus creating a severe risk of suffocation compounded by additional weight of the weighted blanket making it more difficulty for the baby to move the sleep sack or swaddle off of their mouth or nose.[54]

---

[47] See *supra* notes 29 and 39.

[48] *Safe Sleep*, American Academy of Pediatrics, https://www.aap.org/en/patient-care/safe-sleep/ (last visited Aug. 7, 2024).

[49] *Oxygen Therapy in Infants*, MEDLINEPLUS, Nov. 5, 2022, https://medlineplus.gov/ency/article/007242.htm (last visited Aug. 7, 2024).

[50] *Id*.

[51] Kirchner, *supra* note 44.

[52] *See supra* note 48.

[53] Kirchner, *supra* note 44.

[54] *Id*.

82.     <u>Deep Sleep Danger</u>. The third Material Danger associated with weighted baby sleepwear products, like Dreamland's Products, stems from the Products working as intended by manufacturers, like Dreamland. That is, the Products force babies into uninterrupted sleep.[55] Babies, however, are not meant to have so much sleep, and having uninterrupted sleep negatively impacts babies' development of critical survival systems.[56] Dr. Moon stated that "[i]n terms of babies who die of SIDS, what we think is happening is that they can't wake up; there's a problem with their arousal."[57] Therefore, creating a situation where babies are in a deep, uninterrupted sleep disrupts the babies' systems that allow them to startle themselves awake and restabilize.[58] Dr. Moon further stated that "[w]hen babies wake up in the middle of the night, that is actually protective."[59] Thus, the Products' intended purpose inherently makes babies less protected and more susceptible to severe dangers, such as SIDS.

83.     <u>CPSC Warning Not to Use Weighted Baby Sleepwear</u>. These Material Dangers led the CPSC to warn retailers and consumers: "[d]on't use weighted blankets or weighted swaddles for your babies."[60]

84.     Dreamland has further been aware of risks of the Material Dangers associated with children's use of its Products through various consumer complaints made to CPSC, which the

---

[55] *See supra* note 6 ("Our gently weighted, patent-pending Dream Swaddle is the perfect way to help your newborn feel calm, fall asleep faster and stay asleep longer.").

[56] *Sleep and Your Newborn*, KIDS HEALTH, July 2022, https://kidshealth.org/en/parents/sleepnewborn.html. ("Newborns wake every couple of hours to eat. Breastfed babies feed often, about every 2–3 hours. Bottle-fed babies tend to feed less often, about every 3–4 hours.") (last visited Aug. 7, 2024); Kirchner, *supra* note 44 ("'You don't want your baby to sleep for 12 hours at night,' Moon says, and not just because young babies need to wake frequently to feed.").

[57] Kirchner, *supra* note 44.

[58] *Id*.

[59] *Id*.

[60] *Swaddles and Blankets are Unsafe for Sleep; Retailers Should Consider Stopping Sales* (Apr. 15, 2024) (quoting U.S. Consumer Prod. Safety Comm'n, *supra* note 27).

agency in turn sends to Dreamland. For example, on February 15, 2024, a consumer reported the death of her 2-month-old child who was wearing a .8 lb. Product:[61]

---

**Incident Details**

**Incident Description:** Child was placed in Dreamland Baby weighted swaddle sack (0-8 lbs) and placed in swing where she died.
**Incident Date:** 6/16/2023
**Incident Location:** Home/Apartment/Condominium

---

85.     On March 15, 2024, another death was reported while wearing a Product:[62]

---

**Incident Details**

**Incident Description:** My nearly three month old son was wearing a Dreamland Baby Co product, the Dream Weighted Sleep Swaddle. I laid him to sleep and when I left the room I was able to see his face. When I returned, he was face down. I believe he turn and couldn't turn back from the weight of the sleep sack. He passed away.
**Incident Date:** 10/26/2023
**Incident Location:** Home/Apartment/Condominium

---

86.     Despite Dreamland's knowledge of the risks of the Material Dangers related to children's use of the Products, the deaths that have been reported while using its Products, and the scientific, medical, industry and regulatory positions on the Products, it has continued to sell the Products with the Challenged Representations and Material Safety Omissions and has failed to make any effort to redesign the Products to conform to its representations about its safety and compliance with scientific, medical and industry guidance and regulatory standards.

87.     In fact, Dreamland still has a blog post stating that its Products are "a godsend for getting fussy babies sound asleep, and keep[ing] them that way" and that, "[w]hile some may have concerns about the safety of weighted swaddles, there's little evidence to back up the doubt."[63]

88.     Further, Dreamland has failed to warn consumers of the risks associated with the use of the Products. Indeed, instead of recalling the Products, redesigning the Products and/or warning

---

[61] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4559262 (last visited Aug. 7, 2024).

[62] https://www.saferproducts.gov/PublicSearch/Detail?ReportId=4703727 (last visited Aug. 7, 2024).

[63]https://dreamlandbabyco.com/blogs/news/are-weighted-swaddles-safe?_pos=5&_sid=b52cdf427&_ss=r (last visited Aug. 7, 2024).

consumers about them, Dreamland continues to manufacture, market and sell the Products as ***safe*** Products that meet or exceed all scientific, medical and industry guidance and regulatory standards.

89.   When consumers have referenced the 2022 AAP report in Product reviews on Dreamland's website, Dreamland has responded disingenuously that it has no "reason to believe they were unsafe" and that it "proudly stand[s] behind the safety and efficacy of our gently weighted products:"



## IV.   Dreamland Has an On-Going Duty to Evaluate its Products and the Products' Representations

90.   <u>Federally Mandated Duty to Evaluate and Disclose Baby Product Safety Risks.</u> Dreamland, during all relevant times, was under a federal duty to evaluate the Products for unreasonable risk of injury. Specifically, federal regulations require "[e]very manufacturer, distributor, and retailer of a consumer product distributed in commerce who obtains information

which reasonably supports the conclusion that its product creates an unreasonable risk of serious injury or death is required to notify the [CPSC] immediately." 16 C.F.R. § 1115.6(a) (citing 15 U.S.C. 2064(b)(3)). Dreamland is obligated under this regulation to determine whether a product presents an unreasonable risk by examining the "utility of the product or the utility of the aspect of the product that causes the risk, the level of exposure of consumers to the risk, the nature and severity of the hazard presented, and the likelihood of resulting serious injury or death." 16 C.F.R. § 1115.6(b). By conducting this required analysis of the Products, Dreamland knew, or should have known, that the Products present Material Dangers, and yet took no action to eliminate the Material Dangers or, at the very least, warn consumers of the Material Dangers. The AAP classified weighted baby sleepwear products, like Dreamland's Products, as "unnecessary products" as they highlight the extreme safety concerns with the Products.[64]

91.    <u>Federal Hazardous Substance Act.</u> Additionally, the Federal Hazardous Substance Act, codified at 15 U.S.C. §§ 1261, *et seq.* ("FHSA") prohibits the sale of misbranded hazardous substances. *See id.* at § 1263. A misbranded hazardous substance is, among other things:

> "[A] hazardous substance (included a toy, or other article intended for use by children, which is a hazardous substance. . . ), intended, or packaged in a form suitable, for use in the household or by children, if the packaging or labeling of such substance is in violation of an applicable regulation . . . or if such substance . . . fails to bear a label—(1) which states conspicuously . . . (D) the signal word 'WARNING' or 'CAUTION' on all other hazardous substances; (E) an affirmative statement of the principal hazard or hazards, such as 'Flammable,' 'Combustible,' 'Vapor Harmful,' 'Causes Burns,' 'Absorbed Through Skin,' or similar wording descriptive of the hazard; (F) precautionary measures describing the action to be followed or avoided . . . (G) instruction, when necessary or appropriate, for first-aid treatment; . . . (I) instructions for handling and storage of packages which require special care in handling or storage; and (J) the statement . . . (ii) if the article is intended for use by children and is not a banned hazardous substance, adequate directions for the protection of children from the hazard, and (2) on which any statements required under subparagraph (1) of this paragraph are located prominently and are in the English language in conspicuous and legible type in contrast by typography, layout, or color with other printed matter on the label."

---

[64] *See supra* note 48.

1    15 U.S.C. § 1261(p). Accordingly, Dreamland had a duty to investigate and disclose all safety

2    hazards regarding the Products, including any Material Dangers.

3          92.    <u>Dreamland's Duty to Keep Apprised of Prominent Child Safety Groups' Publicized</u>

4    <u>Opinions.</u> Dreamland's duty to evaluate the safety of the Products entails keeping itself apprised of

5    the opinions of prominent, well-known institutions and advocacy groups for the safety of children

6    and baby products. Such groups include the AAP, the CPSC, the NIH and the CDC. Therefore,

7    Dreamland had a duty to keep itself apprised of these groups' opinions regarding the safety of

8    weighted baby sleepwear products, like the Products and specifically, their recommendations that

9    the Products are not used for children.

10   **V.    Dreamland's "Scientific" and "Medical" Support Lack Veracity**

11         93.    At a minimum, Dreamland has ignored the weight of the scientific and medical

12   evidence as well as industry guidelines and regulatory standards regarding the risk of Material

13   Dangers with use of its Products. Worse, the studies Dreamland touts to substantiate the Challenged

14   Representations are irrelevant, misleading and do not support Dreamland's claims. For example, the

15   2020 study referenced in a blog post studied the use of weighted ***blankets***[65] on children with

16   ***neonatal abstinence syndrome*** (NAS), a <u>rare</u> syndrome affecting babies exposed to certain

17   substances during pregnancy, such as opioids.[66] Babies with NAS exhibit symptoms such as

18   hyperactivity, irritability, tremors, excessive high-pitched crying, restlessness, increased tone,

19   jitteriness, poor sleep patterns, sweating, frequent sneezing, increased respiratory rate, excessive

20   sucking, poor feeding, vomiting and watery stools. As such, the study is largely inapplicable to the

---

[65] Ironically, Dreamland claims that weighted blankets are *not* safe. *See supra* note 9, ("Weighted blankets are not safe for infants because regular blankets are not safe for infants; they are a suffocation hazard. Weighted blankets are even more dangerous as their added weight would make it harder for infants to pull the blanket away from their mouth and nose."). Nonetheless, it has sold          weighted          blankets          to          consumers.          *See* https://web.archive.org/web/20240105215521/https://dreamlandbabyco.com/products/dream-weighted-blanket (last visited Aug. 7, 2024).

[66]*See* https://cdn.shopify.com/s/files/1/0158/3415/3024/files/Summe_2020.pdf?v=1587419817 at 2 ("The purposes of this pilot study were (1) to assess the safety of using weighted blankets in the care of hospitalized infants with NAS, (2) to explore the feasibility of using weighted blankets in this patient population, and (3) to obtain preliminary data on effectiveness of weighted blankets in decreasing symptoms of NAS.") (last visited Aug. 7, 2024).

vast majority of consumers to whom the Products are marketed and the children upon which the Products are marketed to be used. Another limitation to the study was the small sample size of only 16 children.[67] Lastly, the study examined the use of weighted blankets with monitored children in a NICU setting, rather than in a non-clinical setting such as a home. As such, the study is largely inapplicable to the vast majority of consumers to whom the Products are marketed.

94.     A second study referenced by Dreamland, conducted in 2012, assessed the physiological effects of the use of weighted blankets *in female adults* (ages 22-33), and is therefore completely irrelevant to safety of weighted sleep sack use on *children*.[68] The same issue plagues Dreamland's citation to a 2006 study on the "Safety and Therapeutic Effects of Deep Pressure Stimulation Using a Weighted Blanket," which again, was conducted on adults rather than children.[69]

95.     As a result, at all times in which the Products were manufactured, marketed and sold, Dreamland knew the weight of the scientific evidence concluded the Products pose the risk of Material Dangers, it did not have credible science to refute those conclusions and yet it used the Challenged Representations and Material Safety Omissions to mislead consumers.

## VI.     Dreamland Omits Any Information Regarding the Products' Material Dangers or Their Failures to Meet Scientific, Medical and Industry Guidance and Regulatory Standards

96.     Despite the medical, scientific, industry and regulatory consensus that weighted sleep products pose the risk of Material Dangers (which Dreamland has constructive and actual knowledge of) and despite Dreamland having no scientific or medical evidence to refute the weight of the credible scientific and medical evidence so concluding, Dreamland continues to omit the Material Dangers from its labeling, packaging or marketing materials.

97.     Moreover, nowhere does Dreamland provide information regarding the AAP, CPSC, NIH or CDC guidelines and recommendations against using weighted sleep products. When

---

[67] *Id*.

[68] https://cdn.shopify.com/s/files/1/1380/9417/files/Deep_Touch_Pressure_Study.pdf?2268144407711311749 (last visited Aug. 7, 2024).

[69] https://www.tandfonline.com/doi/abs/10.1300/J004v24n01_05 (last visited Aug. 7, 2024).

purchasing the Products online, there is no information given to consumers during the transaction process about the AAP, CPSC, NIH or CDC guidelines and recommendations against using weighted sleep products. Similarly, nowhere on the labels, physical packaging or online descriptions of the Products does Dreamland disclose that the AAP, CPSC, NIH and CDC have determined that the use of weighted sleep products is unsafe.

98.     There is no warning or information given to consumers through Dreamland's labeling, packaging, online or marketing materials about the decision by major retailers—specifically, Target, Amazon and Walmart—to pull these items from their shelves and online offerings.

99.     Thus, consumers therefore have no reasonable way to know at the time of purchasing the Products that the AAP, CPSC, NIH and CDC all recommend against the use of the Products and have determined that the Products pose the risk of Material Dangers. Moreover, consumers also have no reasonable way to know that the Products have been pulled from the shelves and online offerings from major retailers, based in large part on the recommendations of the AAP, CPSC, NIH and CDC.

VII.    **Dreamland's Marketing of the Products is Misleading to Reasonable Consumers**

100.    Dreamland engages in deceptive and misleading advertising of the Products to gain a competitive edge in the market—all at the expense of unsuspecting consumers.

101.    Dreamland's use of the Challenged Representations misleads reasonable consumers because no reasonable consumer would purchase or pay a premium price for the Products if they knew the weight of the scientific and medical evidence concludes that they come with the risk of Material Dangers to their child and that the Products do not meet scientific, medical and industry guidelines and regulatory standards.

102.    Dreamland likewise makes Material Safety Omissions that mislead reasonable consumers because any reasonable consumer would want to know—and is entitled to know—that the Products pose the risk of Material Dangers, fail to meet scientific, medical and industry guidance and regulatory standards, and are not recommended for use by the scientific, medical, industry and regulatory communities.

103.    From Dreamland's marketing, consumers cannot reasonably discern that the weight of the scientific and medical evidence concludes the Products pose the risk of Material Dangers and do not meet scientific, medical and industry guidelines and regulatory standards, nor can consumers reasonably decipher that the studies on which Dreamland relies are irrelevant to the Products.

104.    Consumers do not realize that, even when the Products are used as intended, the credible scientific and medical evidence concludes they present Material Dangers. Consumers reasonably expect that Dreamland—which has far greater expertise in product safety and is aware of the scientific and medical literature detailed above—would not advertise the Products with the Challenged Representations and Material Safety Omissions in the face of such significant safety concerns.

105.    As described above, Dreamland fails to include any information on its labeling, packaging, online or marketing materials about the AAP, CPSC, NIH and CDC recommendations.

106.    Similarly, Dreamland does not put consumers on notice of the risks of the Material Dangers to their children when using the Products. Dreamland had, and continues to have, a duty to warn consumers about the Material Dangers presented by the Products, but it did not, and does not. In fact, Dreamland does the opposite by using the Challenged Representations and making the Material Safety Omissions.

107.    Dreamland's failure to include information on the labels, physical packaging, online descriptions or advertising regarding the potential risks of use of the Products is further misleading as an omission.

108.    The expectation that the Products are labeled truthfully given the weight of the credible scientific and medical evidence is material to reasonable consumers' decisions to purchase the Products, particularly because that evidence concludes that weighted baby sleep sacks and swaddles, like Dreamland's Products, pose a risk of harm to children.[70] A reasonable person would

---

[70] By way of example, SIDs is a leading cause of death in approximately 3,400 infants each year and most of these deaths are due to accidental deaths from suffocation or strangulation in otherwise healthy infants.

find it important to his or her purchasing decision whether the Products pose a safety risk and whether the Products meet scientific, medical and industry guidelines and regulatory standards.

109.    Plaintiffs and the Members of the Class purchased the Products for approximately $90.00, a considerable premium over traditional sleep blankets and non-weighted sleep sacks and swaddles. But for Dreamland's Challenged Representations and Material Safety Omissions, however, Plaintiffs and Members of the Class would not have purchased the Products or would not have purchased them on the terms offered. Had consumers been made aware of the Products' risks of Material Dangers, and/or had consumers known that the scientific, medical, industry and regulatory communities advise against the use of the Products, they would not have purchased them, would have paid significantly less for them or would have purchased different products. As a result, consumers have been financially injured by Dreamland's labeling, online marketing and advertising practices.

## VIII.    Plaintiffs Have No Adequate Remedy at Law

110.    Plaintiffs seek restitution if monetary damages are not available. Indeed, restitution under California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") can be awarded in situations where the entitlement to damages may prove difficult. *Cortez v. Purolator Air Filtration Prod. Co.*, 23 Cal. 4th 163, 177 (2000) (Restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred."); *Gutierrez v. Wells Fargo Bank, NA*, 589 F. App'x 824, 827 (9th Cir. 2014) (same); *Caro v. Procter & Gamble Co.*, 18 Cal. App. 4th 644, 661 (1993) ("In a suit arising under Business and Professions Code section 17200 *et seq.*, the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

111.    But even if damages were available, such relief would not be adequate to address the injuries suffered by Plaintiffs and the Class. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g.*, *Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68 (2007), *as modified* (Apr. 24, 2007) (noting that restitution is available even in situations where damages may not be available).

112.     Plaintiffs and the Class seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Dreamland's unfair, unlawful and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

### FED. R. CIV. P. 9(b) ALLEGATIONS
### *(Affirmative and By Omission)*

113.     Although Dreamland is in the best position to know what content it placed on its marketing materials during the relevant timeframe, and the knowledge that it had regarding the Material Dangers and its failure to disclose these, as well as the consensus of the scientific, medical, industry and regulatory committees that the Products should not be used, to the extent necessary, Plaintiffs satisfy the requirements of Rule 9(b) by alleging the following facts with particularity.

114.     <u>Who</u>: Dreamland made, and continues to make, the Challenged Representations relating to the Products. It also made, and continues to make, Material Safety Omissions regarding the Products' Material Dangers and recommendations from the scientific, medical, industry and regulatory communities not to use its Products. It made, and continues to make, these misrepresentations and omissions on the Products' packaging, Defendant's website, and marketing materials, in written form, electronic form and conventional hardcopy form.

115.     <u>What</u>: Dreamland's conduct here was, and continues to be, fraudulent because it misrepresents its Products with the Challenged Representations while omitting and concealing that the Products present the risk of the Material Dangers and run afoul of the scientific, medical, industry and regulatory consensus. Dreamland's conduct deceives Plaintiffs and the Class into believing that the Products pose no risk of Material Dangers to children. Dreamland knows, or should know, this information is material to reasonable consumers, including Plaintiffs and the Class, in making their purchasing decisions; yet it omitted and continues to omit any warning that the Products present the risk of Material Dangers to children, as well as information regarding recommendations from the scientific, medical, industry and regulatory communities not to use its Products. No reasonable consumer would expect that the Products present the risk of Material

-38-

Dangers to children, or that leading professionals have warned against their use.

116.   <u>When</u>: The Challenged Representations and Material Safety Omissions detailed herein were made during the class periods, prior to and at the point of sale, leaving Plaintiffs and the Class unaware of risks of the Material Dangers and professional warnings prior to purchasing the Products.

117.   <u>Where</u>: Dreamland's Challenged Representations and Material Safety Omissions were made, and still are made, on the Products' packaging, marketing materials, on Dreamland's website and through its social media, in written form, electronic form and conventional hardcopy form.

118.   <u>How</u>: Dreamland made, and continues to make, misrepresentations and failed, and continues to fail, to disclose material facts regarding the safety risks of normal use of the Products, as well as any information regarding recommendations from the scientific, medical, industry and regulatory communities not to use its Product, in written form, on its website, electronic form and conventional hardcopy form.

119.   <u>Why</u>: Dreamland made, and continues to make, the Challenged Representations and Material Safety Omissions for the express purpose of inducing Plaintiffs and the Class to purchase the Products, the effect of which was that Dreamland profited by selling the Products to many thousands of consumers.

120.   <u>Injury</u>: Plaintiffs and the Class purchased, or paid more for, the Products when they otherwise would not have absent Dreamland's Challenged Representations and Material Safety Omissions. Further, the scientific, medical, industry and regulatory communities continue to warn against the Products' use, and conclude that the Products continue to pose unreasonable risks of the Material Dangers to children. Consumers continue to suffer economic harm by purchasing Products that present a risk of the Material Dangers to their children.

//

CONSOLIDATED CLASS ACTION COMPLAINT

**TOLLING ALLEGATIONS**

**I.      Discovery Rule**

121.    The causes of action alleged herein, accrued upon discovery of Dreamland's misrepresentations and omissions related to the marketing and advertising of the Products. Because the Dreamland concealed them, Plaintiffs and Members of the Class did not discover, and could not have known, of the Challenged Representations or Material Safety Omissions through reasonable and diligent investigation. Reasonable and diligent investigation did not, and could not, reveal a factual basis for a cause of action based on Dreamland's misrepresentations, omissions and concealment of the Material Dangers and recommendations of the scientific, medical, industry and regulatory communities.

**II.      Fraudulent Concealment**

122.    Any applicable statutes of limitation have been tolled by Dreamland's knowing, active and ongoing concealment and denial of the facts as alleged herein.

123.    Dreamland was, and is, under a continuous duty to disclose to Plaintiffs and the Class the true character, quality and nature of the Products—particularly with respect to the Material Dangers and recommendations from the scientific, medical, industry and regulatory communities not to use the Products.

124.    At all relevant times, and continuing to this day, Dreamland knowingly, affirmatively and actively misrepresented and concealed the true character, quality and nature of the Products and sold the Products into the stream of commerce with the Challenged Representations and Material Safety Omissions.

125.    Given Dreamland's failure to disclose this non-public information, over which Dreamland had exclusive control, about the nature of the Products and attendant risks of Material Dangers—and because Plaintiffs and the Class could not reasonably have known the true nature of the Products or the Material Dangers presented—Plaintiffs and the Class reasonably relied on Dreamland's Challenged Representations and Material Safety Omissions. Had Plaintiffs and the Class known that the Products pose Material Dangers to the public and the scientific, medical, industry and regulatory communities recommend against children's use of the Products, they would

1   not have purchased the Products or would have paid significantly less for them.

2       126.    Plaintiffs and the Class have been kept ignorant by Dreamland of vital information

3   essential to the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiffs

4   and the Class could not reasonably have discovered the true nature of the Products, the Material

5   Dangers they present, or the scientific, medical, industry and regulatory communities'

6   recommendations against children's use of the Products.

7   **III.    Estoppel**

8       127.    Dreamland was, and is, under a continuing duty to disclose to Plaintiffs and the Class

9   the true character, quality and nature of the Products. Dreamland knowingly, affirmatively and

10  actively concealed the true character, quality and nature of the Products, and the concealment is on-

11  going. Dreamland knew of the serious risk of Material Dangers the Products posed to consumers

12  and has actively concealed them. Plaintiffs and the Class reasonably relied on Dreamland's

13  Challenged Representations and Material Safety Omissions. For these reasons, Dreamland is

14  estopped from relying on any statute of limitations in defense of this action.

15      128.    Additionally, Dreamland is estopped from raising any defense of laches due to its

16  own conduct as alleged herein.

17                              **CLASS ALLEGATIONS**

18      129.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and

19  23(c)(4), on behalf of themselves and the Members of the following proposed nationwide class

20  ("Nationwide Class"):

21          **During the fullest period allowed by law, all persons who purchased the
            Products in the United States for personal use and not resale.**
22

23      130.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3) and

24  23(c)(4), on behalf of themselves and the Members of the following proposed multi-state class

25  ("Multi-State Consumer Protection Class"):

26          **During the fullest period allowed by law, all persons who purchased the
            Products in the States of California, Florida, Illinois, New York,
27          Massachusetts, Michigan, Minnesota, Missouri, New Jersey and**

28

**Washington[71] for personal use and not resale.**

131.   Plaintiffs Fehrenbach, Miller and Monsch (collectively "California Plaintiffs") bring this action pursuant to Fed. R. Civ. P. 23, on behalf of themselves and the Members of the following California class ("California Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of California for personal use and not resale.**

132.   Plaintiff Alvarez brings this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and the Members of the following New York class ("New York Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of New York for personal use and not resale.**

133.   Plaintiff Harrington brings this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and the Members of the following Illinois class ("Illinois Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of Illinois for personal use and not resale.**

134.   Plaintiff Muse brings this action pursuant to Fed. R. Civ. P. 23, on behalf of herself and the Members of the following Missouri class ("Missouri Class"):

> **During the fullest period allowed by law, all persons who purchased the Products in the State of Missouri for personal use and not resale.**

135.   The Nationwide Class, Multi-State Consumer Protection Class, the California Class, the New York Class, the Illinois Class and the Missouri Class, are referred to collectively as the "Class" or "Classes," and the Members of the Classes are referred to as the "Class Members." Excluded from the Classes are the following individuals and/or entities: Dreamland and its parents, subsidiaries, affiliates, officers and directors, current or former employees and any entity in which

---

[71] Plaintiffs seek to certify a Multi-State Consumer Protection Class consisting of persons in the following states (and implicating the following statutes): California (Cal. Bus. & Prof. Code §§ 17200, *et seq*.); Florida (Fla. Stat. §§ 501.201, *et seq*.); Illinois (815 ICLS §§ 505/1, *et seq*.); Massachusetts (Mass. Gen. Laws Ch. 93A, *et seq*.); Michigan (Mich. Comp. Laws §§ 445.901, *et seq*.); Minnesota (Minn. Stat. §§ 325F.67, *et seq*.); Missouri (Mo. Rev. Stat. §§ 407.010, *et seq*.); New Jersey (N.J. Stat. §§ 56:8-1, *et seq*.); New York (N.Y. Gen. Bus. Law §§ 349, *et seq*.); and Washington (Wash. Rev. Code §§ 19.86.010, *et seq*.).

Dreamland has a controlling interest; all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

136.     Plaintiffs reserve the right to modify or amend the definition of the proposed Classes before the Court determines whether class certification is appropriate.

137.     <u>Numerosity</u>: Members of each Class are so numerous and geographically dispersed that individual joinder of all Class Members is impracticable. The precise number of Class Members is unknown to Plaintiffs but is likely to be ascertained by Dreamland's records. At a minimum, there likely are at least thousands of Class Members.

138.     <u>Commonality</u>: There are questions of law and fact common to the proposed class(es). Common questions of law and fact include, without limitation:

    A.     whether Dreamland's course of conduct alleged herein violates the statutes and other laws that are pled in this Consolidated Class Action Complaint;

    B.     whether Dreamland knew, or should have known, its Challenged Representations and Material Safety Omissions were false or misleading;

    C.     whether Dreamland was unjustly enriched by retaining monies from the sale of the Products;

    D.     whether certification of each Class is appropriate under Rule 23; and

    E.     whether Plaintiffs and the Members of each Class are entitled to declaratory, equitable, or injunctive relief, and/or other relief, and the scope of such relief.

139.     <u>Typicality</u>: Plaintiffs' claims are typical of the other Class Members because Plaintiffs, as well as Class Members, purchased the Products and relied on the Challenged Representations, other misrepresentations, the Material Safety Omissions, and other omissions made by Dreamland about the Products prior to and at the time of the purchases of the Products. Plaintiffs and the Members of each Class paid for Dreamland's Products and would not have purchased them (or would have paid substantially less for them) had they known that Dreamland's representations were untrue or deceptive, had they been made aware of the risk of the Material

Dangers presented through the use of the Products, or had they been made aware of the recommendations of the scientific, medical, industry and regulatory communities that the Products are not recommended for use.

140.    <u>Adequacy</u>: Plaintiffs will fairly and adequately protect the interests of the proposed Classes as their interests do not conflict with the interests of the Members of the proposed Classes they seek to represent, and they have retained counsel competent and experienced in class action litigation. Thus, the interests of the Members of the Classes will be fairly and adequately protected by Plaintiffs and their counsel.

141.    <u>Predominance</u>: Pursuant to Rule 23(b)(3), the common issues of law and fact identified in this Consolidated Class Action Complaint predominate over any individual ones. Class issues fully predominate over any individual issue because no inquiry into individual conduct is necessary; all that is required is a narrow focus on Dreamland's misconduct detailed at length in this Consolidated Class Action Complaint.

142.    <u>Superiority</u>: A class action is superior to all other available methods for the fair and efficient adjudication of this litigation because individual litigation of each claim is impractical. It would be unduly burdensome to have individual litigation of thousands of individual claims in separate lawsuits, every one of which would present the issues presented in the Consolidated Class Action Complaint/lawsuit. Further, because the damages suffered by any individual Class Member may be relatively modest in relation to the cost of litigation, the expense and burden of individual litigation make it difficult, if not impossible. Furthermore, many of the Class Members may be unaware that claims exist against Dreamland.

143.    <u>Declaratory and Injunctive Relief</u>: Pursuant to Rule 23(b)(2), declaratory and injunctive relief is appropriate in this matter. Dreamland has acted, or refused to act, on grounds generally applicable to Plaintiffs and the other Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Class Members as a whole. Unless a class-wide injunction is issued, Dreamland will continue to advertise, market, promote and sell the Products in an unlawful and misleading manner, as described throughout this Consolidated Class Action Complaint, and Members of the Classes will continue to be misled,

harmed and denied their rights under the law. Plaintiffs and the Classes do not have an adequate remedy at law because damages alone will not stop Dreamland's unlawful misrepresentations and omissions. Additionally, Plaintiffs seek restitution if monetary damages are not available. But even if damages were available, such relief would not be adequate to address the injury suffered by Plaintiffs and the Classes.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Breach of Contract**
***(On Behalf of Plaintiffs and the Nationwide Class; or in the Alternative,
Plaintiffs Fehrenbach, Miller and Monsch for the California Class,
Plaintiff Alvarez for the New York Class, Plaintiff Harrington for the Illinois Class, and
Plaintiff Muse for the Missouri Class)***

144.    Plaintiffs repeat the allegations contained in the paragraphs 1 through 143 as if fully set forth herein.

145.    Plaintiffs bring this claim themselves and on behalf of the Members of the Nationwide Class against Dreamland. Common law breach of contract claims are materially similar in all fifty states. In the alternative, California Plaintiffs bring this claim under California law for themselves and Members of the California Class; Plaintiff Alvarez brings this claim under New York law for herself and Members of the New York Class; Plaintiff Harrington brings this claim under Illinois law for herself and Members of the Illinois Class; and Plaintiff Muse brings this claim under Missouri law for herself and Members of the Missouri Class against Dreamland.

146.    Plaintiffs and Class Members entered into contracts with Dreamland when they placed orders to purchase the Products on Dreamland's website, or otherwise purchased the Products through retail stores. A valid contract existed between Plaintiffs and the Class Members, on one hand, and Dreamland, on the other.

147.    The contracts provided that Plaintiffs and Class Members would pay Dreamland for the Products ordered.

148.    The contracts further required that Dreamland provide Plaintiffs and Class Members with Products that conformed to the Challenged Representations and devoid of the Material Safety Omissions. These were specific and material terms of the contracts.

-45-

149.    Plaintiffs and Class Members paid Dreamland for the Products they ordered and satisfied all other conditions of their contracts.

150.    Dreamland breached the contracts with Plaintiffs and Class Members by failing to provide Products that conformed to the Challenged Representations. Dreamland further breached its contracts by providing Products that presented the risk of Material Dangers to children and by failing to disclose those risks to Plaintiffs and Class Members before and at the time of purchase of the Products.

151.    As a direct and proximate result of Dreamland's breaches, Plaintiffs and Class Members were deprived of the benefit of their bargained-for exchanges and have suffered damages in an amount to be established at trial.

152.    On May 15, 2024, Plaintiff Monsch sent Dreamland a notice letter notifying it of its violations of law as a result of its labeling and advertising of the Products. On May 23, 2024, Plaintiff Fehrenbach sent Dreamland a notice letter notifying it of its violations of law as a result of its labeling and advertising of the Products. On June 5, 2024, Plaintiff Miller sent Dreamland a notice letter notifying it of its violations of law as a result of its labeling and advertising of the Products. On June 24, 2024, Plaintiff Muse sent Dreamland a notice letter notifying it of its violations of law as a result of its labeling and advertising of the Products. On August 6, 2024, Plaintiffs Alvarez and Harrington sent Dreamland a notice letter notifying it of its violations of law as a result of its labeling and advertising of the Products.

**COUNT II**
**Breach of Express Warranty**
**Cal. Com. Code § 2313**
(**On Behalf of the California Plaintiffs for the California Class**)

153.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

154.    The California Plaintiffs bring this claim themselves and on behalf of the Members of the California Class against Dreamland.

155.    California's express warranty statutes provide that "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis

-46-

of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Cal. Com. Code § 2313.

156.    The California Plaintiffs and California Class Members formed a contract with Dreamland at the time they purchased the Products. As part of those contracts, Dreamland promised that the Products conformed to the Challenged Representations and were devoid of the Material Safety Omissions.

157.    These representations and omissions are affirmations of fact or promises that constitute an express warranty and became part of the basis of the bargain between Plaintiffs and Class Members on the one hand, and Dreamland, on the other.

158.    Dreamland made the Challenged Representations and Material Safety Omissions to induce the California Plaintiffs and Members of the California Class to purchase the Products, and California Plaintiffs and California Class Members reasonably and justifiably relied on the Challenged Representations and Material Safety Omissions in purchasing the Products, believing that the Products did in fact conform to those warranties, did not present a risk of the Material Dangers, and met all scientific, medical and industry guidelines and regulatory standards.

159.    All conditions precedent to Dreamland's liability under the above-referenced contract have been performed by California Plaintiffs and California Class Members.

160.    Dreamland has breached the express warranties about the Products because, as alleged above, the Products do not conform to the Challenged Representations, include Material Safety Omissions, present a risk of the Material Dangers, and do not meet all scientific, medical and industry guidelines and regulatory standards. Thus, as alleged herein, these express Challenged Representations are false and misleading.

161.    California Plaintiffs and California Class Members paid a premium price for the Products but did not obtain the full value of the Products as represented. If California Plaintiffs and California Class Members had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, California Plaintiffs and

California Class Members suffered injury and deserve to recover all damages afforded under the law.

162.    On May 15, 2024, Plaintiff Monsch sent Dreamland a notice letter notifying it of its breach of warranty. On May 23, 2024, Plaintiff Fehrenbach sent Dreamland a notice letter notifying it of its breach of warranty. On June 5, 2024, Plaintiff Miller sent Dreamland a notice letter notifying it of its breach of warranty.

**COUNT III**
**Breach of Express Warranty**
**810 ILCS 5/2-313**
***(On Behalf of Plaintiff Harrington and the Illinois Class)***

163.    Plaintiffs repeat the allegations contained in 1 through 143 as if fully set forth herein.

164.    Plaintiff Harrington brings this claim herself and on behalf of the Members of the Illinois Class against Dreamland.

165.    Illinois' express warranty statute provides that provides that "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise"; and "(b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." 810 ILCS 5/2-313.

166.    Plaintiff Harrington and the Illinois Class Members formed a contract with Dreamland at the time they purchased the Products. As part of those contracts, Dreamland promised that the Products conformed to the Challenged Representations, were devoid of the Material Safety Omissions, free of the risks of Material Dangers, and complied with scientific, medical and industry guidelines and regulatory standards.

167.    These representations and omissions are affirmations of fact or promises that constitute an express warranty and became part of the basis of the bargain between Plaintiff Harrington and the Illinois Class Members, on the one hand, and Dreamland, on the other.

168.    Dreamland made the Challenged Representations and Material Safety Omissions to induce Plaintiff Harrington and the Illinois Class Members to purchase the Products, and Plaintiff

-48-

1  Harrington and the Illinois Class Members reasonably and justifiably relied on the Challenged

2  Representations and Material Safety Omissions in purchasing the Products, believing that the

3  Products did in fact conform to those warranties, did not present a risk of the Material Dangers,

4  and met all scientific, medical and industry guidelines and regulatory standards.

5       169.    All conditions precedent to Dreamland's liability under the above-referenced

6  contract have been performed by Plaintiff Harrington and the Illinois Class Members.

7       170.    Express warranties by a seller of consumer goods are created when an affirmation

8  of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the

9  basis of the bargain. Such warranties can also be created by descriptions of the goods which are

10 made as part of the basis of the bargain that the goods shall conform to the description.

11      171.    Dreamland has breached the express warranties about the Products because, as

12 alleged above, the Products do not conform to the Challenged Representations, include Material

13 Safety Omissions, present a risk of the Material Dangers, and do not meet all scientific, medical

14 and industry guidelines and regulatory standards. Thus, as alleged herein, these express

15 representations are false and misleading.

16      172.    Plaintiff Harrington and Members of the Illinois Class paid a premium price for the

17 Products but did not obtain the full value of the Products as represented. If Plaintiff Harrington and

18 Members of the Illinois Class had known of the true nature of the Products, they would not have

19 been willing to pay the premium price associated with them. As a result, Plaintiff Harrington and

20 Members of the Illinois Class suffered injury and deserve to recover all damages afforded under

21 the law.

22      173.    On August 6, 2024, Plaintiffs Harrington sent Dreamland a notice letter notifying it

23 of its breach of warranty.

**COUNT IV**
**Breach of Express Warranty**
**Mo. Stat. § 400.2-313**
***(On Behalf of Plaintiff Muse and the Missouri Class)***

27      174.    Plaintiffs repeat the allegations contained in 1 through 143 as if fully set forth

28 herein.

175.   Plaintiff Muse brings this claim herself and on behalf of the Members of the Missouri Class against Dreamland.

176.   Missouri's express warranty statute provide that "(a) [a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise," and "(b) [a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." Mo. Stat. § 400.2-313.

177.   Plaintiff Muse and the Missouri Class Members formed a contract with Dreamland at the time they purchased the Products. As part of those contracts, Dreamland promised that the Products conformed to the Challenged Representations, were devoid of the Material Safety Omissions, free of the risks of Material Dangers, and complied with scientific, medical and industry guidelines and regulatory standards.

178.   These representations and omissions are affirmations of fact or promises that constitute an express warranty and became part of the basis of the bargain between Plaintiff Muse and the Missouri Class Members, on the one hand, and Dreamland, on the other.

179.   Dreamland made the Challenged Representations to induce Plaintiff Muse and the Missouri Class Members to purchase the Products, and Plaintiff Muse and the Missouri Class Members reasonably and justifiably relied on the Challenged Representations and Material Safety Omissions in purchasing the Products, believing that the Products did in fact conform to those warranties, did not present a risk of Material Dangers, and met all scientific, medical and industry guidelines and regulatory standards.

180.   All conditions precedent to Dreamland's liability under the above-referenced contract have been performed by Plaintiff Muse and the Missouri Class Members.

181.   Express warranties by a seller of consumer goods are created when an affirmation of fact or promise is made by the seller to the buyer, which relates to the goods and becomes the basis of the bargain. Such warranties can also be created by descriptions of the goods which are made as part of the basis of the bargain that the goods shall conform to the description.

182.    Dreamland has breached the express warranties about the Products because, as alleged above, the Products do not conform to the Challenged Representations, include Material Safety Omissions, present a risk of the Material Dangers and do not meet all scientific, medical and industry guidelines and regulatory standards. Thus, as alleged herein, these express representations are false and misleading.

183.    Plaintiff Muse and Members of the Missouri Class paid a premium price for the Products but did not obtain the full value of the Products as represented. If Plaintiff Muse and Members of the Missouri Class had known of the true nature of the Products, they would not have been willing to pay the premium price associated with them. As a result, Plaintiff Muse and Members of the Missouri Class suffered injury and deserve to recover all damages afforded under the law.

184.    On June 24, 2024, Plaintiff Muse, on behalf of herself and all other Class Members, sent Dreamland a notice letter notifying Dreamland of its breach of warranty.

<u>COUNT V</u>
**Breach of Implied Warranty**
**Cal. Com. Code § 2314**
(***On Behalf of California Plaintiffs and the California Class***)

185.    California Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

186.    California Plaintiffs bring this claim themselves and on behalf of the California Class against Dreamland.

187.    California's implied warranty of merchantability statute provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." Cal. Com. Code § 2314(1).

188.    California's implied warranty of merchantability statute also provides that "[g]oods to be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or label if any." *Id.* § 2314(2).

189.    Dreamland is a merchant with respect to the sale of Products. Therefore, a warranty of merchantability is implied in every contract for sale of the Products to California consumers.

190.     By advertising the Products with the Challenged Representations and Material Safety Omissions, Dreamland made an implied promise that the Products conform to the Challenged Representation, do not present a risk of the Material Dangers and met all scientific, medical and industry guidelines and regulatory standards. However, the Products have not "conformed to the promises . . . made on the container or label" because the Products do not conform to the Challenged Representations, contain the Material Safety Omissions, present a risk of the Material Dangers, and do not meet all scientific, medical and industry guidelines and regulatory standards. California Plaintiffs, as well as other California consumers, did not receive the goods as impliedly warranted by Dreamland to be merchantable.

191.     Therefore, the Products are not merchantable, and Dreamland has breached its implied warranty of merchantability in regard to the Products.

192.     All conditions precedent to Dreamland's liability under the above-referenced contract have been performed by California Plaintiffs and California Class Members.

193.     If California Plaintiffs and California Class Members had known that the Products' Challenged Representations and Material Safety Omissions were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Dreamland's breach, California Plaintiffs and Members of the California Class have suffered injury and deserve to recover all damages afforded under the law.

194.     On May 15, 2024, Plaintiff Monsch sent Dreamland a notice letter notifying it of this breach of warranty. On May 23, 2024, Plaintiff Fehrenbach sent Dreamland a notice letter notifying it of this breach of warranty.  On June 5, 2024, Plaintiff Miller sent Dreamland a notice letter notifying it of this breach of warranty.

**COUNT VI**
**Breach of Implied Warranty**
**810 ILCS 5/2-314**
(*On Behalf of Plaintiff Harrington and the Illinois Class*)

195.     Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

196.     Plaintiff Harrington brings this claim herself and on behalf of the Members of the

-52-

1    Illinois Class against Dreamland.

2         197.    Illinois' implied warranty of merchantability statute provides that "a warranty that

3    the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant

4    with respect to goods of that kind." 810 ILCS 5/2-314(1).

5         198.    Illinois' implied warranty of merchantability statute also provides that "[g]oods to

6    be merchantable must be at least such as . . . (f) conform to the promises or affirmations of fact

7    made on the container or label if any." 810 ILCS 5/2-314(2)(f).

8         199.    Dreamland is a merchant with respect to the sale of Products. Therefore, a warranty

9    of merchantability is implied in every contract for sale of the Products to Illinois consumers.

10        200.    By advertising the Products with the Challenged Representations and Material

11   Safety Omissions, Dreamland made an implied promise that the Products conform to the

12   Challenged Representation, do not present a risk of the Material Dangers, and met all scientific,

13   medical and industry guidelines and regulatory standards. However, the Products have not

14   "conformed to the promises . . . made on the container or label" because the Products do not

15   conform to the Challenged Representations, include the Material Safety Omissions, present a risk

16   of the Material Dangers, and do not meet all scientific, medical and industry guidelines and

17   regulatory standards. Plaintiffs Harrington, as well as other Illinois consumers, did not receive the

18   goods as impliedly warranted by Dreamland to be merchantable.

19        201.    Therefore, the Products are not merchantable under Illinois law and Dreamland has

20   breached its implied warranty of merchantability in regard to the Products.

21        202.    All conditions precedent to Dreamland's liability under the above-referenced

22   contract have been performed by Plaintiff Harrington and the Illinois Class Members.

23        203.    If Plaintiff Harrington and Members of the Illinois Class had known that the

24   Products' Challenged Representations and Material Safety Omissions were false and misleading,

25   they would not have been willing to pay the premium price associated with them. Therefore, as a

26   direct and/or indirect result of Dreamland's breach, Plaintiff Harrington and Members of the

27   Illinois Class have suffered injury and deserve to recover all damages afforded under the law.

28        204.    On August 6, 2024, Plaintiffs Harrington sent Dreamland a notice letter notifying it

1  of its breach of warranty.

2  **COUNT VII**
**Breach of Implied Warranty**
3  **Mo. Stat. § 400.2-314**
**(*On Behalf of Plaintiff Muse and the Missouri Class*)**
4

5  205.   Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set

6  forth herein.

7  206.   Plaintiff Muse brings this claim herself and on behalf of the Members of the

8  Missouri Class against Dreamland.

9  207.   Missouri's implied warranty law provides that "a warranty that the goods shall be

10  merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods

11  of that kind." Mo. Stat. § 400.2-314(1).

12  208.   Missouri's implied warranty law also states that "[g]oods to be merchantable must

13  be at least such as . . . (f) conform to the promises or affirmations of fact made on the container or

14  label if any." Mo. Stat. § 400.2-314(2)(f).

15  209.   Dreamland is a merchant with respect to the sale of Products. Therefore, a warranty

16  of merchantability is implied in every contract for sale of the Products to Missouri consumers.

17  210.   By advertising the Products with the Challenged Representations and Material

18  Safety Omissions, Dreamland made an implied promise that the Products conform to the

19  Challenged Representation, are devoid of the Material Safety Omissions, do not present a risk of

20  the Material Dangers, and met all scientific, medical and industry guidelines and regulatory

21  standards. However, the Products have not "conformed to the promises . . . made on the container

22  or label" because the Products do not conform to the Challenged Representations, include the

23  Material Safety Omissions, present a risk of the Material Dangers, and do not meet all scientific,

24  medical and industry guidelines and regulatory standards. Plaintiff Muse, as well as other Missouri

25  consumers, did not receive the goods as impliedly warranted by Dreamland to be merchantable.

26  211.   Therefore, the Products are not merchantable under Missouri law and Dreamland

27  has breached its implied warranty of merchantability in regard to the Product.

28  212.   If Plaintiff Muse and Members of the Missouri Class had known that the Products'

-54-

Challenged Representations and Material Safety Omissions were false and misleading, they would not have been willing to pay the premium price associated with them. Therefore, as a direct and/or indirect result of Dreamland's breach, Plaintiff Muse and Members of the Missouri Class have suffered injury and deserve to recover all damages afforded under the law.

213.    On June 24, 2024, Plaintiff Muse sent Dreamland a notice letter notifying it of this breach of warranty.

## COUNT VIII
### Fraudulent Misrepresentation/Omission
**(On Behalf of Plaintiffs and the Nationwide Class; or in the Alternative, California Plaintiffs for the California Class, Plaintiff Alvarez for the New York Class, Plaintiff Harrington for the Illinois Class, and Plaintiff Muse for the Missouri Class)**

214.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

215.    Plaintiffs bring this claim themselves, and on behalf of the Nationwide Class against Dreamland. Common law fraud claims are materially similar in all fifty states. In the alternative, California Plaintiffs bring this claim under California law for themselves and Members of the California Class, Plaintiff Alvarez brings this claim under New York law for herself and Members of the New York Class, Plaintiff Harrington brings this claim under Illinois law for herself and Members of the Illinois Class, and Plaintiff Muse brings this claim under Missouri law for herself and Members of the Missouri Class against Dreamland.

216.    As alleged above, Dreamland made false and misleading representations to Plaintiffs and other Class Members when it marketed the Products with the Challenged Representations.

217.    When Dreamland made these Challenged Representations, Dreamland knew they were false and/or acted recklessly in making them.

218.    Dreamland's fraudulent Challenged Representations were knowing and intentional and were intended to induce Plaintiffs and Class Members to purchase the Products. Plaintiffs and Class Members reasonably relied on them in purchasing the Products.

219.    Dreamland's Challenged Representations were a substantial factor and proximate

cause of the damages and losses to Plaintiffs and Class Members.

220.    In addition, class-wide reliance can be inferred because Dreamland's Challenged Representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to buy the Products.

221.    Dreamland also made Material Safety Omissions in selling the Products. Specifically, Dreamland concealed information related to whether the Products presented risks of the Material Dangers, and whether the Products met all scientific, medical and industry guidelines and regulatory standards and, more troublingly, the recommendations that consumers do not use the Products with their children.

222.    In deciding to purchase the Products from Dreamland, Plaintiffs and Class Members reasonably relied on Dreamland's Material Safety Omissions to form the mistaken belief that the Products did not present risk of the Material Dangers and met all scientific, medical and industry guidelines and regulatory standards.

223.    Dreamland had a duty to disclose the Material Safety Omissions because it had superior knowledge and access to material facts about the Products, and a reasonable consumer could not have reasonably expected or known that the Products presented risk of the Material Dangers or failed to meet all scientific, medical and industry guidelines and regulatory standards.

224.    Plaintiffs and Class Members were injured as a direct and proximate result of Dreamland's conduct because Plaintiffs and Class Members would not have purchased the Products, or would have paid significantly less for them, if they knew the Products' Material Safety Omissions were false and misleading, or that the Products presented risk of the Material Dangers and did not meet scientific, medical and industry guidelines and regulatory standards.

225.    Dreamland's acts were done maliciously, oppressively, deliberately, with intent to defraud and in reckless disregard of Plaintiffs' and the Class Members' rights and well-being in order to enrich Dreamland. Dreamland's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT IX**
**Negligent Misrepresentation/Omission**
***(On Behalf of Plaintiffs and the Nationwide Class; or in the Alternative,***
***California Plaintiffs for the California Class, Plaintiff Alvarez for the New York Class, Plaintiff***
***Harrington for the Illinois Class, and Plaintiff Muse for the Missouri Class)***

226.     Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

227.     Plaintiffs bring this count on behalf of themselves and the Nationwide Class against Dreamland. Common law negligent misrepresentation claims are materially similar in all fifty states. In the alternative, California Plaintiffs bring this claim under California law for themselves and Members of the California Class, Plaintiff Alvarez brings this claim under New York law for herself and Members of the New York Class, Plaintiff Harrington brings this claim under Illinois law for herself and Members of the Illinois Class, and Plaintiff Muse brings this claim under Missouri law for herself and Members of the Missouri Class against Dreamland.

228.     As alleged more fully above, Dreamland made false and misleading representations to Plaintiffs and other Class Members when it marketed the Products with the Challenged Representations.

229.     When Dreamland made these Challenged Representations, it knew or reasonably should have known that the Challenged Representations were false and misleading. Dreamland had no reasonable grounds for believing that these Challenged Representations were true when made.

230.     Dreamland intended that Plaintiffs and Class Members rely on these Challenged Representations. Plaintiffs and Class Members reasonably relied on the Challenged Representations in purchasing the Products.

231.     Dreamland's Challenged Representations were a substantial factor and proximate cause of the damages and losses to Plaintiffs and Class Members.

232.     In addition, class-wide reliance can be inferred because Dreamland's Challenged Representations were material, *i.e.*, a reasonable consumer would consider them important in deciding whether to buy the Products.

233.   Dreamland also made Material Safety Omissions in selling the Products. Specifically, Dreamland concealed information related to whether the Products presented risks of the Material Dangers, and whether the Products met all scientific, medical and industry guidelines and regulatory standards. Moreover, Dreamland concealed information related to the scientific, medical, industry and regulatory communities' concerns with the Products and, more troublingly, the recommendations that consumers do not use the Products with their children.

234.   In deciding to purchase the Products from Dreamland, Plaintiffs and Class Members reasonably relied on Dreamland's Material Safety Omissions to form the mistaken belief that the Products did not present risk of the Material Dangers and met all scientific, medical and industry guidelines and regulatory standards.

235.   Defendant had a duty to disclose the Material Safety Omissions because it had superior knowledge and access to material facts about the Products, and a reasonable consumer could not have reasonably expected or known that the Products presented risk of the Material Dangers or failed to meet all scientific, medical and industry guidelines and regulatory standards.

236.   Plaintiffs and Class Members were injured as a direct and proximate result of Dreamland's conduct because Plaintiffs and Class Members would not have purchased the Products, or would have paid significantly less for them, if they knew the Products were unsafe and did not meet regulatory and industry standards.

**COUNT X**
**Quasi Contract/Unjust Enrichment/Restitution**
***(On Behalf of Plaintiffs and the Nationwide Class; or in the Alternative, California Plaintiffs for the California Class, Plaintiff Alvarez for the New York Class, Plaintiff Harrington for the Illinois Class, and Plaintiff Muse for the Missouri Class)***

237.   Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

238.   Plaintiffs bring this claim themselves and on behalf of the Members of the Nationwide Class against Dreamland. In the alternative, California Plaintiffs bring this claim under California law for themselves and Members of the California Class, Plaintiff Alvarez brings this claim under New York law for herself and Members of the New York Class, Plaintiff Harrington

-58-

1   brings this claim under Illinois law for herself and Members of the Illinois Class, and Plaintiff

2   Muse brings this claim under Missouri law for herself and Members of the Missouri Class against

3   Dreamland.

4       239.    As alleged herein, Dreamland has made misleading Challenged Representations

5   and Material Safety Omissions to Plaintiffs and Members of the Classes to induce them to purchase

6   the Products. Plaintiffs and Members of the Classes have reasonably relied on the misleading

7   Challenged Representations and Material Safety Omissions but have not received all of the benefits

8   promised by Dreamland. Plaintiffs and members of the proposed Classes have therefore been

9   induced by Dreamland's misleading Challenged Representations and Material Safety Omissions

10  about the Products and paid more money to Dreamland for the Products than they otherwise would

11  and/or should have paid.

12      240.    Plaintiffs and Members of the Classes have conferred a benefit upon Dreamland as

13  Dreamland has retained monies paid to them by Plaintiffs and Members of the Classes.

14      241.    The monies received by Dreamland were obtained under circumstances that were

15  at the expense of Plaintiffs and Members of the Classes—*i.e.*, Plaintiffs and Members of the

16  Classes did not receive the full value of the benefit conferred upon Dreamland. Therefore, it is

17  inequitable and unjust for Dreamland to retain the profit, benefit, or compensation conferred upon

18  it.

**COUNT XI**
***Violation of State Consumer Protection Statutes***
**(*On Behalf of Plaintiffs and the Multi-State Consumer Protection Class*)**

22      242.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set

23  forth herein.

24      243.    Plaintiffs bring this claim themselves and on behalf of the Members of the Multi-

25  State Consumer Protection Class against Dreamland.

26      244.    Plaintiffs and Multi-State Consumer Protection Class Members have been injured

27  as a result of Dreamland's violations of the state consumer protection statutes listed in Footnote

28  71, which also provide a basis for redress to Plaintiffs and Multi-State Consumer Protection Class

Members based on Dreamland's fraudulent, deceptive, unfair, and unconscionable acts, practices and conduct.

245.    Dreamland's conduct as alleged herein violates the consumer protection, unfair trade practices and deceptive acts laws of each of the jurisdictions encompassing the Multi-State Consumer Protection Class.

246.    Dreamland's marketing of the Products violates these prohibitions by deceiving consumers into believing the Challenged Representation, that the Products do not pose the risk of Material Dangers, and meet all scientific, medical and industry guidelines and regulatory standards, when this is not true.

247.    Dreamland has engaged in fraudulent and/or deceptive conduct which creates a likelihood of confusion or of misunderstanding in violation of applicable law.

248.    Dreamland engaged in misleading and deceptive advertising by using the Challenged Representations and Material Safety Omissions. Dreamland chose to package and market the Products in this way to impact consumer choices, extract price premiums and gain market dominance, as it is aware that all consumers who purchased the Products would be impacted by its Challenged Representations and Material Safety Omissions and would reasonably believe Dreamland's false and misleading Challenged Representations and Material Safety Omissions.

249.    Dreamland intended that Plaintiffs and other Multi-State Consumer Protection Class Members would rely upon the material Challenged Representations and Material Safety Omissions.

250.    Dreamland's concealment, omissions and other deceptive conduct were likely to deceive and cause misunderstanding and/or in fact caused Plaintiffs and other Multi-State Consumer Protection Class Members to be deceived about the true nature of the Products.

251.    As a direct and proximate result of Dreamland's violations of the laws identified in Footnote 71, Dreamland caused Plaintiffs and other Multi-State Consumer Protection Class Members to have suffered ascertainable loss of money caused by Dreamland's Challenged Representations and Material Safety Omissions.

252.    Had they been aware of the true nature of the Products, Plaintiffs and other Multi-

State Consumer Protection Class Members either would have paid less for the Products or would not have purchased them at all.

253.    Pursuant to the aforementioned states' unfair and deceptive practices laws, Plaintiffs and the Multi-State Consumer Protection Class Members are entitled to recover compensatory damages, restitution, punitive and special damages, including, but not limited to, treble damages, reasonable attorneys' fees and costs, and other injunctive or declaratory relief as deemed appropriate or permitted pursuant to the relevant law.

**COUNT XII**
**Violation of California's Consumers Legal Remedies Act ("CLRA")**
**California Civil Code § 1750, *et seq*.**
**(On Behalf of California Plaintiffs and the Nationwide Class; or in the**
**Alternative, California Plaintiffs for the California Class)**

254.    California Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

255.    California Plaintiffs bring this claim themselves and on behalf of the Members of the Nationwide Class against Dreamland. In the alternative, California Plaintiffs bring this claim under California law for themselves and on behalf of Members of the California Class against Dreamland.

256.    The Products are "good[s]" within the meaning of Cal. Civ. Code § 1761(a), and the purchases of the Products by Plaintiffs and Class Members constitute "transactions" within the meaning of Cal. Civ. Code § 1761(e).

257.    Cal. Civ. Code § 1770(a)(5) prohibits "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have . . . ." By using the Challenged Representations, Dreamland has represented and continues to represent that the Products have characteristics that they do not have. Therefore, Dreamland has violated section 1770(a)(5) of the CLRA.

258.    Cal. Civ. Code § 1770(a)(7) prohibits "[r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." By using the Challenged Representations, Dreamland has represented and continues

-61-

to represent that the Products are of a particular standard that they do not meet. Therefore, Dreamland has violated section 1770(a)(7) of the CLRA.

259. Cal. Civ. Code § 1770(a)(9) prohibits "[a]dvertising goods or services with intent not to sell them as advertised." By using the Challenged Representations, and then delivering Products that present the risk of Material Dangers and that do not meet all scientific, medical and industry guidelines and regulatory standards, Dreamland has advertised the Products with characteristics it intended not to provide to consumers. As such, Dreamland has violated section 1770(a)(9) of the CLRA.

260. Cal. Civ. Code § 1770(a)(16) prohibits "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not." By using the Challenged Representations, and then delivering Products that present the risk of Material Dangers and that do not meet all scientific, medical and industry guidelines and regulatory standards, Dreamland has not supplied products in accordance with their Challenged Representations. As such, Dreamland has violated section 1770(a)(16) of the CLRA.

261. At all relevant times, Dreamland has known or reasonably should have known that the Challenged Representations are false and deceptive, and that California Plaintiffs and Class Members would reasonably and justifiably rely on these Challenged Representations when purchasing the Products. Nonetheless, Dreamland deceptively advertises the Products as such in order to deceive consumers into believing they are receiving a weighted sleep product for their child that does not pose the risk of Material Dangers and meets scientific, medical and industry guidelines and regulatory standards.

262. Dreamland also made Material Safety Omissions concerning the safety of its Products. Specifically, Dreamland concealed information related to whether the Products presented risks of the Material Dangers, and whether the Products met all scientific, medical and industry guidelines and regulatory standards. As a result of Dreamland's Material Safety Omissions, reasonable consumers formed the mistaken belief that the Products were safe to use and met all scientific, medical and industry guidelines and regulatory standards.

263. California Plaintiffs and Class Members have justifiably relied on Dreamland's

-62-

misleading Challenged Representations and Material Safety Omissions when purchasing the Products. Moreover, based on the materiality of Dreamland's misleading and deceptive conduct, reliance may be presumed or inferred for California Plaintiffs and Class Members.

264.     California Plaintiffs and Class Members have suffered and continue to suffer injuries caused by Dreamland because they would have paid significantly less for the Products, or would not have purchased them at all, had they known the truth about the Products.

265.     Pursuant to Cal. Civ. Code § 1782, Plaintiff Monsch notified Dreamland in writing by certified mail sent on May 15, 2024, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above. Pursuant to Cal. Civ. Code § 1782, Plaintiff Fehrenbach notified Dreamland in writing by certified mail sent on May 23, 2024, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above. Pursuant to Cal. Civ. Code § 1782, Plaintiff Miller notified Dreamland in writing by certified mail sent on June 5, 2024, of its violations of § 1770 described above and demanded that it correct the problems associated with the actions detailed above.

266.     More than 30 days have passed since Dreamland's receipt of the first CLRA notice letter sent to it (Plaintiff Monsch's May 15, 2024 letter), yet Dreamland has not cured its conduct. As such, California Plaintiffs seek damages, as well as all remedies available under the law.

**COUNT XIII**
**Violation of California's False Advertising Law ("FAL")**
**California Business & Professions Code § 17500, *et seq.***
***(On Behalf of California Plaintiffs and the Nationwide Class; or in the Alternative, California Plaintiffs for the California Class)***

267.     California Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

268.     California Plaintiffs bring this claim themselves and on behalf of the Members of the Nationwide Class against Dreamland. In the alternative, California Plaintiffs bring this claim under California law for themselves and on behalf of Members of the California Class against Dreamland.

269.     The FAL makes it "unlawful for any person to make or disseminate or cause to be

-63-

made or disseminated before the public . . . in any advertising device . . . or in any other manner or means whatever, including over the Internet, any statement, concerning . . . personal property or services professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

270.    Through the Challenged Representations, Dreamland has made representations and continues to make the Challenged Representations to the public, including California Plaintiffs and Class Members, about the safety of the Products and the Products' compliance with scientific, medical and industry guidelines and regulatory standards. These Challenged Representations are false and misleading because the Products pose the risk of Material Dangers, and do not meet scientific, medical and industry guidelines and regulatory standards.

271.    Dreamland has also made Material Safety Omissions concerning the safety of its Products. Specifically, Dreamland concealed information related to whether the Products presented risks of the Material Dangers, and whether the Products met all scientific, medical and industry guidelines and regulatory standards. As a result of Dreamland's Material Safety Omissions, reasonable consumers formed the mistaken belief that the Products were safe to use and met all scientific, medical and industry guidelines and regulatory standards.

272.    Because Dreamland has disseminated misleading information and has omitted material information regarding the Products, and Dreamland knows, knew, or should have known through the exercise of reasonable care that the Challenged Representations and Material Safety Omissions were and continue to be misleading, Dreamland has violated the FAL.

273.    California Plaintiffs and Class Members do not have an adequate remedy at law because damages alone will not stop Dreamland from continuing to make the Challenged Representations and Material Safety Omissions. Damages will only address past injuries suffered by California Plaintiffs and Class Members. Dreamland continues to market the Products as safe and compliant with scientific, medical and industry guidelines and regulatory standards when the Products pose the risk of Material Dangers and do not comply with scientific, medical and industry guidelines and regulatory standards. Only injunctive relief can prevent any future harm.

274. Additionally, California Plaintiffs and Class Members seek restitution if monetary damages are not available. Indeed, restitution under the FAL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez*, 23 Cal.4th at 177 (finding that restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred"); *Gutierrez*, 589 F. App'x at 827 (same); *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 *et seq.*, the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

275. Even if damages were available, such relief would not be adequate to address the injury suffered by California Plaintiffs and Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g.*, *Fladeboe*, 150 Cal. App. 4th at 68, *as modified* (noting that restitution is available even in situations where damages may not be available).

276. California Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Dreamland's fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

**COUNT XIV**
**Violation of California's Unfair Competition Law ("UCL")**
**California Business & Professions Code § 17200, *et seq.***
**(*On Behalf of California Plaintiffs and the Nationwide Class; or in the*
*Alternative, California Plaintiffs for the California Class*)**

277. California Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

278. California Plaintiffs bring this claim themselves and on behalf of the Members of the Nationwide Class against Dreamland. In the alternative, California Plaintiffs bring this claim under California law for themselves and on behalf of Members of the California Class against Dreamland.

-65-

279.   The UCL, Cal. Bus. & Prof Code § 17200, provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising . . . ."

280.   Under the UCL, a business act or practice is "unlawful" if it violates any established state or federal law. Dreamland's false and misleading advertising of the Products was and continues to be "unlawful" because it violates the CLRA, the FAL, and other applicable laws as described herein. As a result of Dreamland's unlawful business acts and practices, Dreamland has unlawfully obtained money from California Plaintiffs and Class Members.

281.   Under the UCL, a business act or practice is "unfair" if its conduct is substantially injurious to consumers, offends public policy, and is immoral, unethical, oppressive, and unscrupulous, as the benefits for committing such acts or practices are outweighed by the gravity of the harm to the alleged victims. Dreamland's conduct was and continues to be of no benefit to purchasers of the Products, as it is misleading, unfair, unlawful and is injurious to consumers who rely on the labeling and advertising. Deceiving consumers into believing they will receive a weighted sleep product that does not pose the risks of Material Dangers, and that meets all scientific, medical and industry guidelines and regulatory standards, is of no benefit to consumers. Therefore, Dreamland's conduct was and continues to be "unfair." As a result of Dreamland's unfair business acts and practices, Dreamland has and continues to unfairly obtain money from California Plaintiffs and Class Members.

282.   Under the UCL, a business act or practice is "fraudulent" if it actually deceives or is likely to deceive members of the consuming public. Dreamland's conduct here was and continues to be fraudulent because it has the effect of deceiving consumers into believing the Products do not pose the risk of Material Dangers and meet all scientific, medical and industry guidelines and regulatory standards, when the opposite is true. Because Dreamland's conduct has misled or was likely to mislead California Plaintiffs and Class Members, Dreamland's conduct was "fraudulent." As a result of Dreamland's fraudulent business acts and practices, Dreamland has and continues to fraudulently obtain money from California Plaintiffs and Class Members.

283.   California Plaintiffs and Class Members do not have an adequate remedy at law

because damages alone will not stop Dreamland's Challenged Representations or Material Safety Omissions. Damages will only address past injuries suffered by California Plaintiffs and Class Members. Dreamland continues to market the Products in the foregoing manner. Only injunctive relief can prevent any future harm.

284.     Additionally, California Plaintiffs and Class Members seek restitution if monetary damages are not available. Indeed, restitution under the UCL can be awarded in situations where the entitlement to damages may prove difficult. *Cortez*, 23 Cal.4th at 177 (finding that restitution under the UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of the overcharge when the transaction occurred"); *Gutierrez*, 589 F. App'x at 827; *Caro*, 18 Cal. App. 4th at 661 ("In a suit arising under Business and Professions Code section 17200 *et seq.*, the court 'is empowered to grant equitable relief, including restitution in favor of absent persons, without certifying a class action.'").

285.     Even if damages were available, such relief would not be adequate to address the injury suffered by California Plaintiffs and Class Members. Unlike damages, the Court's discretion in fashioning equitable relief is very broad. *Cortez*, 23 Cal.4th at 180. Thus, restitution would allow recovery even when normal consideration associated with damages would not. *See, e.g., Fladeboe*, 150 Cal. App. 4th at 68 (noting that restitution is available even in situations where damages may not be available).

286.     California Plaintiffs and Class Members seek all monetary and nonmonetary relief allowed by law, including restitution stemming from Dreamland's unfair, unlawful and fraudulent business practices; declaratory relief; reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5; injunctive relief and other appropriate equitable relief.

### COUNT XV
**Violation Of New York General Business Law § 349 ("GBL")**
***(On Behalf of Plaintiff Alvarez and the New York Class)***

287.     Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

288.     Plaintiff Alvarez brings this claim individually and on behalf of the Members of the

proposed New York Class against Dreamland.

289.    GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state."

290.    The conduct of Dreamland alleged herein constitutes "unlawful" deceptive acts and practices in violation of GBL § 349, and as such, Plaintiff Alvarez and the New York Class Members seek monetary damages.

291.    Dreamland misleadingly, inaccurately and deceptively advertised and marketed its Products to consumers through the Challenged Representations and Material Safety Omissions, as described above.

292.    Dreamland's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff Alvarez and the New York Class to purchase and pay a premium for the Products when they otherwise would not have.

293.    Plaintiff Alvarez and the New York Class have been injured inasmuch as they paid a premium for Products that posed the risk of Material Dangers and did not meet all scientific, medical and industry guidelines or regulatory standards, contrary to Dreamland's Challenged Representations and Material Safety Omissions about the Products. Had they known the truth about the Products, Plaintiff Alvarez and the New York Class would not have purchased the Products or would have paid significantly less for them. Accordingly, Plaintiff Alvarez and the New York Class received less than what they bargained and/or paid for.

294.    Dreamland made its untrue and/or misleading statements and material omissions willfully, wantonly and with reckless disregard for the truth.

295.    As a result of Dreamland's unlawful deceptive acts and practices, Plaintiff Alvarez and the New York Class are entitled to monetary, compensatory, statutory, treble and punitive damages, restitution and disgorgement of all moneys obtained by means of Dreamland's unlawful conduct, interest and attorneys' fees and costs.

CONSOLIDATED CLASS ACTION COMPLAINT

**COUNT XVI**

**Violation Of New York General Business Law § 350**
(*On Behalf of Plaintiff Alvarez and the New York Class*)

296.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

297.    Plaintiff Alvarez brings this claim individually and on behalf of the Members of the proposed New York Class against Dreamland.

298.    GBL § 350 provides, in part, as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

299.    GBL § 350-a(1) provides, in part, as follows:

> The term "false advertising" means advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such representations with respect to the commodity or employment to which the advertising relates under the conditions prescribed in said advertisement, or under such conditions as are customary or usual. …

300.    Dreamland's Challenged Representations are materially misleading representations inasmuch as they misrepresent that the Products do not pose the risk of Material Dangers and meet all scientific, medical and industry guidelines and regulatory standards.

301.    Dreamland also made Material Safety Omissions. Specifically, Dreamland concealed information related to whether the Products presented the risk of Material Dangers, and whether the Products met all scientific, medical and industry guidelines and regulatory standards. As a result of Dreamland's Material Safety Omissions, reasonable consumers formed the mistaken belief that the Products were safe to use and met all scientific, medical and industry guidelines and regulatory standards.

302.    Dreamland's advertising of the Products induced Plaintiff Alvarez and the New York Class to buy Dreamland's Products. Thus, Dreamland made material Challenged

-69-

Representations and Material Safety Omissions about the Products.

303.    Plaintiff Alvarez and the New York Class have been injured inasmuch as they paid a premium for Products that posed the risk of Material Dangers and did not meet all scientific, medical and industry guidelines or regulatory standards, contrary to Dreamland's Challenged Representations and Material Safety Omissions about the Products. Had they known the truth about the Products, Plaintiff Alvarez and the New York Class would not have purchased the Products or would have paid significantly less for them. Accordingly, Plaintiff Alvarez and the New York Class received less than what they bargained and/or paid for

304.    Dreamland made the foregoing untrue and/or misleading representations willfully, wantonly and with reckless disregard for the truth.

305.    As a result of Dreamland's unlawful deceptive acts and practices, Plaintiff Alvarez and the New York Class are entitled to monetary, compensatory, statutory, treble and punitive damages, restitution and disgorgement of all moneys obtained by means of Dreamland's unlawful conduct, interest and attorneys' fees and costs.

## COUNT XVII
**Violation of Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA")**
**815 ILCD 505/1, *et seq*.**
**(*On Behalf of Plaintiff Harrington and the Illinois Class*)**

306.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

307.    Plaintiff Harrington brings this claim individually and on behalf of the Members of the proposed Illinois Class against Dreamland.

308.    The ICFA, 815 Ill. Comp. Stat. 505/1, *et seq*. prohibits unfair methods of competition and unfair or deceptive acts or practices, including, but not limited to, the use or employment of any deception, fraud, false pretense, false promise, or misrepresentation in the conduct of any trade or commerce.

309.    Plaintiff Harrington and the Members of the Illinois Class are consumers who purchased the Products.

310.    As alleged herein, Dreamland misrepresented the Products through statements,

omissions, ambiguities, half-truths and/or actions.

311.    Specifically, Plaintiff Harrington and the Illinois Class were led to believe the Challenged Representations were true, the Products did not pose the risk of Material Dangers, and were being sold in compliance with scientific, medical and industry guidelines and regulatory standards, even though they were not.

312.    Dreamland's conduct, described above, in misrepresenting material facts and omitting others regarding the Products, constitutes an unfair or deceptive practice and was and is likely to mislead reasonable consumers, as detailed above.

313.    Dreamland's Challenged Representations and Material Safety Omissions were material, as they affected and influenced the purchasing decisions of Plaintiff Harrington and the Members of the Illinois Class.

314.    Dreamland's practices were unfair because they offended public policy, were immoral, unethical, oppressive and unscrupulous, and caused substantial injury to consumers.

315.    Plaintiff Harrington and the Illinois Class would not have purchased the Products or would have paid less for the Products if the true facts about them had been known. As a result, they suffered damages and are entitled to all remedies available under the ICFA.

**COUNT XVIII**
**Violation of Missouri's Merchandising Practices Act ("MMPA")**
**Mo. Stat. § 407.020,** *et seq.*
***(On Behalf of Plaintiff Muse and the Missouri Class)***

316.    Plaintiffs repeat the allegations contained in paragraphs 1 through 143 as if fully set forth herein.

317.    Plaintiff Muse brings this claim individually and on behalf of the Members of the proposed Missouri Class against Dreamland.

318.    The MMPA provides that it is unlawful to "act, use or employ . . . deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce . . . ." Mo. Stat. § 407.020(1).

319.    The Products are "merchandise" pursuant to Mo. Stat. § 407.010(4), and Dreamland

-71-

is selling the Products in trade or commerce.

320.    As demonstrated above, Dreamland's use of the Challenged Representations and Material Safety Omissions constitutes deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of the Products.

321.    Dreamland's Challenged Representations and Material Safety Omissions regarding the Products are material (*i.e.*, the type of misrepresentations to which a reasonable person would attach importance and would be induced to act thereon in making purchase decisions), because they relate to the safety and scientific, medical, industry and regulatory compliance, and thus the quality, of the Products.

322.    At all relevant times, Dreamland knew, or reasonably should have known, the fact that the Products present the risk of Material Dangers, do not meet scientific, medical and industry guidelines and regulatory standards, and that Plaintiff Muse and other Members of the Missouri Class would reasonably and justifiably rely on the Challenged Representations and Material Safety Omissions about the Products in purchasing them.

323.    Plaintiff Muse and Members of the Missouri Class purchased the Products for personal, family or household purposes.

324.    Plaintiff Muse and other Members of the Missouri Class reasonably and justifiably relied on Dreamland's Challenged Representations and Material Safety Omissions when purchasing the Products.

325.    Plaintiff Muse and other Members of the Missouri Class have suffered an ascertainable loss caused by Dreamland because they would not have purchased the Products or would have paid significantly less for the Products, had they known that Dreamland's conduct was misleading and fraudulent.

326.    Dreamland's conduct was intentional, wrongful and malicious and entitles Plaintiff Muse and proposed Missouri Class Members to the recovery of punitive damages as authorized by statute. Mo. Rev. Stat. § 407.025.

327.    In addition, Dreamland's conduct has caused Plaintiff Muse and Members of the

-72-

Missouri Class irreparable injury. As described herein, Dreamland has engaged in unlawful and misleading conduct on a routine and automated basis, harming Missouri Class Members in a uniform manner. Unless restrained and enjoined, Dreamland will continue such conduct. Therefore, Plaintiff Muse requests injunctive relief, and such other equitable relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, themselves and on behalf of the proposed Classes, respectfully pray for following relief:

A.   Certification of this case as a class action on behalf of the proposed Classes defined above, appointment of Plaintiffs as Class representatives and appointment of their counsel as Class Counsel;

B.   A declaration that Dreamland's actions, as described herein, violate the claims described herein;

C.   An award of injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and the proposed Classes, including, *inter alia*, an order prohibiting Dreamland from engaging in the unlawful act described above;

D.   An award to Plaintiffs and the proposed Classes of restitution and/or other equitable relief, including, without limitation, restitutionary disgorgement of all profits and unjust enrichment that Dreamland obtained from Plaintiffs and the proposed Classes as a result of its unlawful, unfair and fraudulent business practices described herein;

E.   An award of all economic, monetary, actual, consequential and compensatory damages caused by Dreamland's conduct;

F.   An award of nominal, punitive, treble and statutory damages;

G.   An award to Plaintiffs and their counsel of reasonable expenses and attorneys' fees;

H.   An award to Plaintiffs and the proposed Classes of pre-judgment and post-judgment interest, to the extent allowable; and

I.   For such further relief that the Court may deem just and proper.

CONSOLIDATED CLASS ACTION COMPLAINT

1

**DEMAND FOR JURY TRIAL**

2

     Plaintiffs, on behalf of themselves and the proposed Classes, hereby demand a jury trial

3

with respect to all issues triable of right by jury.

4

5

Dated: August 7, 2024                               Respectfully submitted,

6

7

Zachary Arbitman
George Donnelly

*/s/ Benjamin Heikali*
Benjamin Heikali (SBN 307466)
Katherine Phillips (SBN 353048)

8

**FELDMAN SHEPHERD
WOHLGELERNTER TANNER**

**TREEHOUSE LAW, LLP**

9

**WEINSTOCK & DODIG, LLP**
1845 Walnut Street, 21st Floor

2121 Avenue of the Stars, Suite 2580
Los Angeles, CA 90067

10

Philadelphia, PA 19103
T: (215) 567-8300

Tel: (310) 751-5928
bheikali@treehouselaw.com

11

F: (215) 567-8333

kphillips@treehouselaw.com

12

zarbitman@feldmanshepherd.com
gdonnelly@feldmanshepherd.com

Melissa S. Weiner

13

**PEARSON WARSHAW, LLP**

14

Bart D. Cohen
**BAILEY & GLASSER, LLP**

328 Barry Avenue S., Suite 200
Wayzata, MN 55391

15

1622 Locust Street
Philadelphia, PA 19103

Tel: 612-389-0600
Fax: 612-389-0610

16

(215) 274-9420
bcohen@baileyglasser.com

mweiner@pwfirm.com

17

*Attorneys for Plaintiff Victoria Monsch*

Rachel Soffin
**MILBERG COLEMAN BRYSON**

18

**PHILLIPS GROSSMAN PLLC**
800 S. Gay Street, Suite 1100

19

Ryan J. Clarkson (SBN 257074)
rclarkson@clarksonlawfirm.com

Knoxville, TN 37929
rsoffin@milberg.com

20

Bahar Sodaify (SBN 289730)
bsodaify@clarksonlawfirm.com

21

Alan Gudino (SBN 326738)
agudino@clarksonlawfirm.com

Harper T. Segui
**MILBERG COLEMAN BRYSON**

22

**CLARKSON LAW FIRM, P.C.**
22525 Pacific Coast Highway

**PHILLIPS GROSSMAN, LLP**
825 Lowcountry Blvd., Suite 101

23

Malibu, CA 90265
Tel: (213) 788-4050

Mt. Pleasant, SC 29464
hsegui@milberg.com

24

Fax: (213) 788-4070

25

*Attorneys for Plaintiffs Megan Fehrenbach,
Amy Alvarez, Johannah Harrington*

26

*Attorneys for Plaintiff Tuliisa Miller*

27

28

Nyran Rose Rasche
Alex Lee
**CAFFERTY CLOBES**
**MERIWETHER**
**& SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
Facsimile: (312) 782-4485
nrasche@caffertyclobes.com
alee@caffertyclobes.com

*Attorneys for Plaintiff Haley Muse*

CONSOLIDATED CLASS ACTION COMPLAINT